[Crim. No. 1085.  Second Appellate District, Division Two.—July 8, 1924.]

THE PEOPLE, Respondent, v. ROBERT MATTHEW et al., Defendants; MURPHY WILLIAMS et al., Appellants.

[1] CRIMINAL LAW — VERDICT — EVIDENCE—PROVINCE OF TRIAL COURT AND JURY — APPEAL.—If the evidence which bears against the accused, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law—of which alone the appellate court has jurisdiction—and becomes one of fact, upon which the decision of the jury and the trial court is final and conclusive.

[2] ID.—VERDICT — EVIDENCE—DUTY OF REVIEWING COURT.—It is the duty of a reviewing court, in passing upon the question whether the evidence is sufficient to support the verdict, to consider in its strongest light all evidence which tends to support the verdict, to disregard such testimony as conflicts therewith and to affirm the

1.  See 8 Cal. Jur. 582; 2 R. C. L. 193.
2.  See 8 Cal. Jur. 584.

judgment if there be any substantial showing which tends to establish the guilt of the accused.

[3] ID.—MURDER—CONSPIRACY TO COMMIT ROBBERY—EVIDENCE—INFERENCES—VERDICT.—In this prosecution for murder, the evidence was sufficient to justify the inference that the defendants, who were in an automobile at the time of robbery of a proprietor of a store, as well as their codefendants, who entered the store and robbed said proprietor, conspired to rob the proprietor, and that the latter's life was taken in the prosecution of the common design, and the conspiracy to rob being established, and the evidence was sufficient to support the verdict of guilty of murder against the defendants.

[4] ID.—ROBBERY—CONSPIRACY — MURDER—EXTENT OF GUILT.—Where a number of persons conspire together to perpetrate a robbery, and a homicide is committed by one of the conspirators in furtherance of the common purpose to rob, each is as accountable as though his own hand had intentionally fired the fatal shot or given the fatal blow, and each is guilty of murder.

[5] ID.—VOLUNTARY CHARACTER OF STATEMENT—WAIVER OF OBJECTION—APPEAL. — In such prosecution, where one of the defendants waived the objection that his statement was not given freely and voluntarily, he cannot complain that it was not shown that said statement was made freely and voluntarily.

[6] ID.—STATEMENT NOT AMOUNTING TO CONFESSION OF GUILT — ADMISSIBILITY OF—FOUNDATION UNNECESSARY.—In such prosecution, where the statement of the other defendant was not tantamount to a confession of guilt, it was not necessary to lay a foundation that it was made freely and voluntarily before it could be received in evidence.

[7] ID.—CONSPIRACY—ORDER OF PROOF.—The general rule is that proof of the existence of the conspiracy ordinarily should precede proof of the acts or declarations of a co-conspirator made pending the conspiracy and in aid and furtherance of the common design, but the rule in this respect is not absolute and unyielding.

[8] ID.—FACTS RELATING TO CONSPIRACY BLENDED WITH OTHER FACTS—DECLARATIONS AND ACTS OF CONSPIRATORS. — Where the facts from which the conspiracy is to be inferred are so intimately blended with other facts going to constitute the crime that it is

3.   Homicide in carrying out unlawful conspiracy, note, 68 L. R. A. 193.   See, also, 5 Cal. Jur. 502; 13 Cal. Jur. 729.

4.   See 13 R. C. L. 730.

5.   See 8 Cal. Jur. 240; 26 R. C. L. 1046, 1052; 2 R. C. L. 69, 96.

6.   See 8 Cal. Jur. 108; 1 R. C. L. 579.

7.   See 8 Cal. Jur. 120; 1 R. C. L. 521; 5 R. C. L. 1089.

difficult to separate them, it is not essential to the introduction of evidence of the acts and declarations of one of the conspirators that evidence should first be introduced to establish *prima facie*, in the opinion of the court, the fact of conspiracy.

[9] ID.—CONSPIRACY—INSTRUCTION—FAILURE TO REQUEST—WAIVER OF OBJECTION.—In such prosecution, while it would have been proper to give an instruction telling the jury to disregard the acts and declarations of a co-conspirator unless they believed that a conspiracy was sufficiently proved, the defendants are not in a position to complain of the omission to give such an instruction, where no instruction of that character was requested by the defendants, nor any intimation made that it should have been given.

[10] ID.—INSTRUCTIONS—EFFECT OF FAILURE TO REQUEST.—Where the trial court has instructed generally as to the issues, if the defendant desires a particular instruction, or an instruction upon a particular phase of the case, he should submit it with a proper request that it be given; otherwise a failure to give it is not error.

[11] ID. — CONSPIRACY — INSTRUCTIONS — JURY NOT MISLED.—In such prosecution, where proof of the conspiracy was in point of fact supplied by the prosecution before it rested, and the court instructed the jury generally upon the law bearing upon the issues in the case and gave a full and correct definition of conspiracy, the jury was not misled to the injury of defendants by the failure to instruct the jury to disregard the acts and declarations of a co-conspirator unless they believed that a conspiracy was sufficiently proved.

[12] ID.—ADMISSIONS—EVIDENCE.—In such prosecution, any extrajudicial admission which one defendant may have made was admissible against him, and the other defendant cannot on appeal complain of this evidence where he did not object to it in the court below at the time when it was received.

[13] ID.—EVIDENCE—STATEMENT OF MURDERERS.—In such prosecution, no error was committed when the prosecution put in evidence the statements made by the defendants and their codefendants in the district attorney's office, where so much of the statement of one of the murderers as was not made in the presence and hearing of the others was admitted as evidence against that particular one, and any statement made by one murderer in the presence and hearing of the others which was denied by any other murderer was not received as evidence against the murderer or murderers by whom it was denied.

9. See 8 Cal. Jur. 309; 14 R. C. L. 795.

12. Confession of defendant as admissible against self and codefendant, notes, 4 Ann. Cas. 918; 18 Ann. Cas. 274. See, also, 8 Cal. Jur. 108; 1 R. C. L. 551.

[14] ID.—CROSS-EXAMINATION—PROPER RULING ON OBJECTION.—In such
prosecution, where a witness had testified on her cross-examination
that her car (the car driven by one of the defendants at the time
of the murder) was not a "rent car," and that so far as she knew
such defendant had never used it to carry passengers for hire, and
counsel for such defendant endeavored further to pursue this line
of cross-examination, the court very properly sustained the prosecu-
tion's objection that the question had been asked and answered.

[15] ID.—ALLEGED MISCONDUCT OF PROSECUTING ATTORNEY—JUDGMENTS
—APPEAL.—Judgments of conviction cannot be reversed for inad-
vertences upon the part of prosecuting attorneys in asking improper
questions and sometimes unintentionally mistaking facts unless
upon an examination of the record, including the evidence, the con-
clusion is reached that they caused a miscarriage of justice; and
in this prosecution, the record shows that defendants had a fair
trial and no miscarriage of justice appears.

[16] ID.—EXPRESSIONS OF TRIAL JUDGE—OPINION—EFFECT OF.—In such
prosecution, reversible error cannot be predicated upon the alleged
ground that the trial court, when ruling upon certain objections,
dropped expressions in the hearing of the jury which tended to
indicate that he thought the evidence showed there was an attempt
to commit robbery and that he entertained an opinion respecting
the veracity of a witness whom it was sought to impeach, unless
such conduct resulted in a miscarriage of justice.

[17] ID.—REMARKS OF TRIAL JUDGE—WHEN JUSTIFIED.—In ruling upon
objections to offered evidence it is not improper for the trial judge
to mention the fact to which the evidence relates, or to state the
reasons for his ruling. Such remarks, although made in the pres-
ence of the jury, are not addressed to them and will not be pre-
sumed to influence their conduct.

[18] ID.—JUDGES OF EVIDENCE — INSTRUCTIONS.—In such prosecution,
where upon the final submission of the case the court instructed the
jurors to the effect that they were the exclusive judges of the evi-
dence and of the credibility of the witnesses, that it was their
function to determine all questions of fact, that the court had
nothing to do with the facts, and that if it had said anything
during the trial which might seem to indicate that it had an opin-
ion upon any of the facts, such expressions should be entirely
disregarded by them, such instruction was sufficient to remove all
apprehension that the remarks of the court would have any preju-
dicial effect upon the minds of the jurors.

14   See 28 R. C. L. 602.
15.   See 8 Cal. Jur. 621; 2 R. C. L. 242.
16.   See 8 Cal. Jur. 610; 2 R. C. L. 256.

[19] ID.—INSTRUCTION RELATING TO MURDER OF FIRST DEGREE — JURY NOT MISLED BY USE OF A PARTICULAR WORD.—In such prosecution, defendants cannot successfully predicate error upon the use of the word "here" in an instruction relating to murder of the first degree, where such word was not intended as a reference to the case at bar, but to those circumstances which the statute makes conclusive evidence of premeditation.

[20] ID.—TERMINATION OF CONSPIRACY — EFFECT OF — INSTRUCTION— FAILURE TO REQUEST — WAIVER OF OBJECTION—ROBBERY.—In such prosecution, if the defendants deemed it essential to their protection to have the jury particularly charged upon the question as to when a conspiracy terminates, and the effect thereof upon the admissibility of subsequent acts and declarations of a co-conspirator, it was their duty to ask it, and in the absence of such request they will be deemed to have been satisfied with the charge as given, and the omission will not be held error; and for the same reason the failure to give a definition of the crime of robbery was not error.

---

(1) 17 **C. J.**, p. 261, sec. 3503.   (2) 17 **C. J.**, p. 223, sec. 3569, p. 255, sec. 3593.   (3) 30 **C. J.**, p. 302, sec. 548.   (4) 29 **C. J.**, p. 1074, sec. 46.   (5) 17 **C. J.**, p. 211, sec. 3557 (Anno.).   (6) 16 **C. J.**, p. 629, sec. 1247.   (7) 16 **C. J.**, pp. 648, 649, sec. 1288.   (8) 16 **C. J.**, p. 649, sec. 1288.   (9) 16 **C. J.**, p. 1058, sec. 2500.   (10) 16 **C. J.**, p. 1056, sec. 2498.   (11) 17 **C. J.**, p. 349, sec. 3706.   (12) 16 **C. J.**, p. 669, sec. 1339; 17 **C. J.**, p. 56, sec. 3331.   (13) 16 **C. J.**, p. 660, sec. 1314, p. 669, sec. 1339.   (14) 40 **Cyc.**, p. 2518.   (15) 16 **C. J.**, p. 893, sec. 2229; 17 **C. J.**, p. 368, sec. 3751.   (16) 17 **C. J.**, p. 295, sec. 3637.   (17) 16 **C. J.**, p. 831, sec. 2101.   (18) 16 **C. J.**, p. 828, sec. 2094; 17 **C. J.**, p. 296, sec. 3637.   (19) 30 **C. J.**, p. 348, sec. 601.   (20) 16 **C. J.**, p. 1057, sec. 2498.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Arthur Keetch, Judge.   Affirmed.

The facts are stated in the opinion of the court.

Samuel Rosenthal for Appellants.

U. S. Webb, Attorney-General, and H. H. Linney and John W. Maltman, Deputy Attorneys-General, for Respondent.

---

20.   See 8 Cal. Jur. 309; 14 R. C. L. 795.

FINLAYSON, P. J.—This appeal is by the defendants Williams and Pope, who, with the defendants Matthew, Warmley, and Sinuel, were jointly charged with the murder of one Coleman Stone, the proprietor of a grocery at Bell Station, near the city of Los Angeles. The defendant Warmley, it would seem, was not apprehended. The remaining four defendants were tried jointly. Matthew and Sinuel were convicted of murder in the first degree, the death penalty was imposed upon them, and they have taken an appeal to the supreme court. The defendants Pope and Williams were convicted of murder in the second degree, and now appeal to this court from the judgment of conviction and from the order denying their motion for a new trial.

The appeal to this court is based upon the alleged insufficiency of the evidence to support the verdict against Pope and Williams, upon asserted errors of law in admitting and in· excluding evidence and in giving and refusing certain instructions, and upon alleged misconduct of the district attorney.

[1] It is, of course, well settled that if the evidence which bears against the accused, considered by itself and without regard to conflicting evidence, is sufficient to support the verdict, the question ceases to be one of law—of which alone this court has jurisdiction—and becomes one of fact, upon which the decision of the jury and the trial court is final and conclusive. (*People* v. *Emerson,* 130 Cal. 562 [62 Pac. 1069].) [2] Accordingly, as a reviewing court it is our duty, in passing upon the question whether the evidence is sufficient to support the verdict, to consider in its strongest light all evidence which tends to support the verdict, to disregard such testimony as conflicts therewith and to affirm the judgment if there be any substantial showing which tends to establish the guilt of the accused.

The facts, as shown by the testimony which bears most strongly against the accused, are substantially these: At about 6:30 o'clock on the evening of October 30, 1923, the accused, all of. whom are negroes, drove in a Winton automobile to a spot on Becker Avenue, about half a block west of Stone's grocery. There the machine, with Pope at the wheel, was brought to a stop. The defendant Sinuel alighted from the car and proceeded to the grocery, presently fol-

lowed by the defendant Matthew. After entering the store Sinuel asked Stone for a package of cigarettes, tendering a dollar bill in payment. About this time Stone's son-in-law, standing in the doorway and peering into the store, saw his father-in-law apparently looking down at his hand "making change," while Sinuel was seen to walk around the end of the counter, "pull a gun" from his overcoat and walk behind the counter toward the unsuspecting grocer. At about the same instant Matthew was seen to "poke an automatic over the counter at Stone." Thereupon the son-in-law left the spot where he had been standing watching these proceedings. He left to get his "gun." An instant later Stone was heard to cry out, and then there came the muffled report of a pistol. The evidence shows that it was Sinuel who fired the shot. Stone was mortally wounded and died the next day. Sinuel and Matthew made admissions to the effect that they entered the grocery with the intention of committing robbery. The evidence for the prosecution discloses beyond all question that the killing was committed in the perpetration of or attempt to perpetrate robbery, and that it was a brutal murder. The real question, so far as the appellants Pope and Williams are concerned, is this: Was there sufficient evidence to justify their conviction upon the theory either that they were aiders and abettors of the homicide, or that they, together with Sinuel and Matthew, had entered into a conspiracy to commit robbery and that Stone's life was taken in the course of the prosecution of the common design?

The facts tending to establish that such a conspiracy was entered into are these: The Winton automobile in which the men were riding on the evening of the homicide belonged to a colored woman, a Mrs. Braxton, who lived at 620 Ceres Avenue, in the city of Los Angeles. She, it appears, had entered into some sort of an arrangement with Sinuel and with an agent of the concern from which she had purchased the car on credit, whereby Sinuel was given an opportunity to become the purchaser of the car if he so desired. It would seem, however, that notwithstanding this arrangement, whatever its nature may have been, Mrs. Braxton continued to treat the car as her own and to exercise all the rights of proprietorship. Pope was hired by her as her chauffeur, receiving as compensation for his services his board and

lodging.   Pope, Sinuel and Matthew occupied rooms in Mrs. Braxton's house.   At about 5 o'clock on the afternoon of the day of the homicide Mrs. Braxton, who had been using her car that afternoon, returned home, told Pope to put the machine in the garage and strictly enjoined him not to take it out.   It seems that on the preceding night Pope had taken the car without Mrs. Braxton's permission and had not returned with it until 3 o'clock in the morning.   Late in the afternoon of the day on which the murder was committed Sinuel, Matthew, and Williams went to a resort at Twenty-sixth Street and Boyle Avenue, in the city of Los Angeles, where they procured and drank a quantity of intoxicating liquor.   At about 6 o'clock in the evening Pope, disobeying his employer's order not to take the car out of the garage, drove up to the house on Twenty-sixth Street where the three other defendants were drinking.   He was accompanied by Warmley.   Upon the arrival of Pope and Warmley at this place with Mrs. Braxton's automobile, Sinuel, Matthew, and Williams entered the car and were driven by Pope in an easterly direction beyond the outskirts of Los Angeles. On their way back the five men passed through Bell Station, where, as we have stated, the car was brought to a stop about half a block west of the grocery, when Sinuel and Matthew got out and the killing of Stone occurred.   After alighting from the machine Sinuel ''snatched'' from Warmley, who remained in the car, the revolver with which Stone was shot.   When the shot was fired Warmley exclaimed, ''Those niggers [referring to Sinuel and Matthew] done shot somebody,'' and ordered Pope to drive back to town. Thereupon Pope put the transmission in gear—the engine had been left running while Sinuel and Matthew were in the grocery—and accompanied by Warmley and Williams drove back to the house at 620 Ceres Avenue.   Meanwhile Sinuel and Matthew made their escape from the scene of the shooting, walked some distance to a street-car and arrived at the Ceres Avenue house some time after Pope and his two companions reached the same destination.   During the comparatively short interval that the automobile was standing on Becker Avenue about half a block from the grocery, and while Sinuel and Matthew were carrying out their plan to rob the proprietor, Pope got out of the car, and seeing another machine approaching from the east stepped in front

of it and raised his hand. Thereupon the driver of that vehicle, a woman, stopped her car. Pope looked at her but said nothing, and she then drove on. The driver of that machine, after she had driven about a quarter of a mile from the spot where she had been stopped, heard the report of the pistol.

After Pope, Sinuel, and Matthew had returned to the house at 620 Ceres Avenue they, with two other men—neither of the latter had any connection with the crime—entered the Winton machine at about 9 o'clock that evening and drove to Santa Ana, in Orange County, where Sinuel endeavored to find accommodations at some hotel. There Sinuel and Matthew left the machine, and the next day those two took a bus to San Diego. Pope and the other two men returned in the automobile to Los Angeles, arriving there at about 3 o'clock in the morning. While in Santa Ana, after Sinuel and Matthew had left the machine, Pope, who had gotten out of the car at a gasoline station, stood for a moment with drooping head, in an attitude of absorbed contemplation. Presently one of his companions said something to him, when he straightened up, got back into the car and drove to Los Angeles.

The defendant Williams, who occupied a room at 1520 East Fourteenth Street in the city of Los Angeles, returned to his quarters shortly after 9 o'clock on the evening of the day in question. Upon his return he engaged in conversation with a woman who also lived at the same place, in the course of which he said: "That fellow shot a man out to the store. I heard the report of a gun and we drove off and left them. I will bet it will be in the papers." Williams took a blackjack from his pocket, showed it to the woman and said that he took it from "one of the fellows who was out there"—referring to those who were his companions at the scene of the homicide. Williams told the officers, when questioned a few days subsequent to the shooting, that Matthew had the blackjack when he got out of the machine to follow Sinuel to the store, and that he, Williams, found it after the party had returned to Los Angeles.

[3] We think the foregoing circumstances are sufficient to justify the inference that all of the defendants, Pope and Williams as well as Matthew and Sinuel, conspired to rob Stone, and that the latter's life was taken in the prosecution

of the common design. As was said in *People* v. *Lawrence,* 143 Cal. 153 [68 L. R. A. 193, 76 Pac. 896] : "It was not necessary to support proof of the conspiracy to show that the parties met and actually agreed to jointly undertake the perpetration of the robbery. From the secrecy with which unlawful undertakings of that character are adopted it would, in almost all instances, be impossible to make such proof, so that in all prosecutions which involve proof of a conspiracy it may be proved by facts and circumstances sufficient to satisfy the jury of its existence, and the weight and sufficiency of that evidence to prove such a conspiracy is a matter for the jury."

Testimony was introduced on behalf of both appellants to show that they were without knowledge of the purpose of Sinuel and Matthew to rob. Indeed, there is throughout the case a sharp conflict in the evidence, as is usual in actions of this character. Pope claimed that he was acting as Sinuel's chauffeur, that he drove as he was directed by Sinuel, that he stopped the car near the scene of the attempted robbery because Sinuel ordered him to stop there, and that he was without guilty knowledge of Sinuel's unlawful intentions. But the circumstances strongly tend to refute any such claim of innocence. Pope was hired by Mrs. Braxton, who testified that she owned the car. In spite of her orders not to take the machine out of the garage, Pope, who is conceded to have been Mrs. Braxton's employee, stole away and joined his guilty companions. When Sinuel and Matthew left the machine to go the grocery Pope did not turn off the ignition, but allowed the motor to continue running in readiness for a quick escape. The fact that he stepped out of the car, held up his hand, stopped a passing motorist and scanned her face tends to indicate that he was determined to chance no possible frustration of the plan to rob. Sinuel, as he was alighting from the car to make his way toward the grocery, scuffled with Warmley and "snatched" a pistol from him. It may well be inferred that this act was observed by Pope, and if so he must have had an inkling of Sinuel's sinister designs. Pope drove from the scene when the shot was fired and upon hearing Warmley exclaim, "Those niggers done shot somebody." It is not probable that had he believed Sinuel and Matthew went to the store for an innocent purpose he would have hurriedly

deserted those two companions, particularly if it were true, as he claimed, that he was hired by Sinuel to drive the car on this evening. On the contrary, it is more than likely that had he possessed no guilty knowledge of the evil intentions of Sinuel and Matthew he would have waited to see if either of them had been waylaid and shot by some malefactor—that he would have stayed to render such assistance, if any, as his comrades might require—instead of hurrying from the scene as though impelled by a guilty conscience. If he, Sinuel, and Matthew were not inseparably linked by the firm ties that bind conspirators, why should he have helped his fellows to escape by driving them with all haste to Santa Ana? Certainly he had every reason to know before that trip was undertaken that Warmley was not mistaken when he exclaimed, "Those niggers done shot somebody." While no single circumstance might be sufficient to create more than a suspicion of guilt, all of them, taken collectively, are of a sufficiently incriminating character to warrant the inference, as a reasonable conclusion, that Pope was a party to a conspiracy to rob the grocer.

Nor do the incriminating circumstances point any the less unerringly to the guilt of Williams. He admitted that he saw Matthew take with him the blackjack when the latter left the Winton automobile to join Sinuel in his mission to rob. He also must have seen Sinuel snatch the pistol from Warmley. Seeing these things and making no protest, the natural inference is that Williams knew what enterprise was on foot and acquiesced therein because he also had entered into the conspiracy to rob. Pope and Williams doubtless realized that if the machine had been stopped immediately in front of the grocery, and if all of the five men had entered the establishment at once, the proprietor, suspecting the possibility of foul play, would probably have been put upon his guard and so would have exercised greater vigilance. This consideration affords an explanation of why it was that but two of the men left the car to carry out the common design.

If, as we hold, the testimony is sufficient to justify the conclusion that all of the defendants conspired to rob Stone, then the evidence is sufficient to support the verdict against these two appellants. [4] The general rule is well settled that where a number of persons conspire together to perpetrate a robbery, and a homicide is committed by one of the

conspirators in furtherance of the common purpose to rob, each is as accountable as though his own hand had intentionally fired the fatal shot or given the fatal blow, and each is guilty of murder. (*People* v. *Vasquez,* 49 Cal. 560; *People* v. *Lawrence, supra; People* v. *Raber,* 168 Cal. 316 [143 Pac. 317].)

We come now to appellants' assignments of error in the admission of evidence. The prosecution introduced in evidence certain admissions made by Sinuel, Matthew, Williams, and Pope in the office of the district attorney. The learned trial judge was at considerable pains to instruct the jurors, at the time when this evidence was offered, that a statement by one defendant not made in the presence and hearing of the others was admissible only as against the defendant making it; also that a statement by one defendant, though made in the presence and hearing of the others, was not to be considered as evidence against any of the other defendants who challenged the truthfulness of the statement at the time when it was made. But it is claimed that it was not shown that the statements were made freely and voluntarily. The point is destitute of merit. **[5]** Williams waived the objection that his statement was not given freely and voluntarily. **[6]** As to Pope, it is sufficient to say that his admissions were not tantamount to a confession of guilt, and therefore it was not necessary to lay a foundation before they could be received in evidence. In giving the officers his version of the facts Pope stoutly maintained that he was innocent of all wrongdoing. In no part of his narrative did he state or admit that he had done any wrongful or unlawful act. None of the facts admitted by him imported guilt or involved a crime. True, his statement involves certain admissions of fact which, when taken in connection with other proved facts in the case, are circumstances of an incriminatory nature; but it is by no means a confession of guilt. His statement, therefore, was admissible without any preliminary proof that it was given freely and voluntarily. (*People* v. *Peete,* 54 Cal. App. 333 [202 Pac. 51].) Moreover, it was shown by the testimony of the deputy district attorney who was present when the admissions were made that each of the accused gave his statement freely and voluntarily, without duress, intimidation, or threat, or previous inducement, promise or offer of leniency.

It is claimed that, as to Pope and Williams, the court erred in admitting evidence of the acts of Matthew and Sinuel in the grocery before the prosecution had made out a *prima facie* case of conspiracy. **[7]** It unquestionably is the general rule that proof of the existence of the conspiracy ordinarily should precede proof of the acts or declarations of a co-conspirator made pending the conspiracy and in aid and furtherance of the common design. But the rule in this respect is not absolute and unyielding; and sometimes, for the sake of convenience, evidence of the acts and declarations of an alleged conspirator is admitted before sufficient proof of the conspiracy is given. **[8]** Thus where, as here, the facts from which the conspiracy is to be inferred are so intimately blended with other facts going to constitute the crime that it is difficult to separate them, it is not essential to the introduction of evidence of the acts and declarations of one of the conspirators that evidence should first be introduced to establish *prima facie,* in the opinion of the court, the fact of conspiracy. (*People* v. *Fehrenbach,* 102 Cal. 394 [36 Pac. 678]; *People* v. *Sing,* 42 Cal. App. 397 [183 Pac. 865].)

**[9]** Appellants complain that the court failed to instruct the jury to disregard the acts and declarations of a co-conspirator unless they believed that a conspiracy was sufficiently proved. It is true that it would have been proper to give such an instruction, but since no instruction of that character was requested by any of the defendants, nor any intimation made that it should be given, appellants are not in a position to complain of its omission. The court carefully instructed the jury generally upon the law bearing upon the issues in the case, and gave a full and correct definition of conspiracy. **[10]** The rule is that where the court has instructed generally as to the issues, if the defendant desires a particular instruction, or an instruction upon a particular phase of the case, he should submit it with a proper request that it be given; otherwise a failure to give it is not error. (*People* v. *Fowler,* 178 Cal. 657, 663 [174 Pac. 892]; *People* v. *Rogers,* 163 Cal. 476, 484 [126 Pac. 143]; *People* v. *Williams,* 184 Cal. 590, 594 [194 Pac. 1019]; *People* v. *Fultz,* 109 Cal. 258, 262 [41 Pac. 1040]; *People* v. *Findley,* 132 Cal. 301, 306 [64 Pac. 472].) In *Allen* v. *Commonwealth,* 26 Ky. Law Rep. 807 [82 S. W. 589],

it was held that where a conspiracy to murder and the connection of each defendant therewith was shown, a failure to instruct as to the extent and circumstances under which evidence of the acts and declarations of co-conspirators, not made in the presence of the others, were to be received by the jury was not error. There the court says: "We do not think such an instruction was necessary in this case, because the conspiracy was fully proved by the testimony of the commonwealth, and the connection of each of the appellants with that conspiracy also shown by competent evidence, and no act or declaration was proven for which the appellants were not each liable. The instructon defining a conspiracy that was given by the court contained all the law that was necessary for the guidance of the jury on that subject." [11] In the present case proof of the conspiracy was in point of fact supplied by the prosecution before it rested. It is evident, therefore, that upon the whole case the jury was not misled to the injury of appellants. (See *People* v. *Brotherton*, 47 Cal. 388, 400, 401.)

It is contended that the court erred in admitting in evidence a statement of Williams, made after the commission of the crime, to the effect that all of the defendants were at the scene of the homicide, that somebody was shot and that he (Williams) took a blackjack from one of his companions. Appellants invoke the well-established rule that statements made by one conspirator after the completion of the offense, and which are simply narratives of the events concerning the accomplished crime, are not admissible against a co-conspirator unless made in his presence. [12] A complete answer to this objection is that any extrajudicial admission which Williams may have made was unquestionably admissible against him, and that Pope cannot now complain of this evidence since he did not object to it in the court below at the time when it was received. [13] For reasons already indicated, no error was committed when the prosecution put in evidence the statements made by the four men in the district attorney's office. As we have pointed out, so much of Matthew's statement as was not made in the presence and hearing of his codefendants was admitted as evidence against Matthew only; and any statement made by one defendant in the presence and hearing of the others which was denied by any other defendant was not received

as evidence against the defendant or defendants by whom it was denied.

[14] It is claimed by counsel for Pope that the court improperly restricted him in his cross-examination of Mrs. Braxton. That witness had testified on her cross-examination that her car was not a "rent car," and that so far as she knew Pope had never used it to carry passengers for hire. Counsel for Pope endeavored further to pursue this line of cross-examination, but the court very properly sustained the prosecution's objection that the question had been asked and answered.

Appellants complain of alleged misconduct on the part of the prosecuting attorney in that, so it is claimed, he propounded improper questions and made statements of facts not in evidence. The record does not show that the prosecuting attorney willfully attempted to place before the jury any improper matter, either by questions asked or statements made. [15] In the heat and zeal of a trial attorneys will sometimes ask improper questions and sometimes unintentionally mistake facts; but judgments cannot be reversed for inadvertencies of this character unless upon an examination of the record, including the evidence, we reach the conclusion that they caused a miscarriage of justice. (Const., art. VI, sec. 4½; *People* v. *Loomis*, 170 Cal. 347 [149 Pac. 581].) The record in this case shows that appellants had a fair trial, and no miscarriage of justice appears.

[16] What we have said respecting the alleged misconduct of the district attorney applies with equal force to the claim that the learned trial judge, when ruling upon certain objections, dropped expressions in the hearing of the jury which tended to indicate that he thought the evidence showed there was an attempt to commit robbery and that he entertained an opinion respecting the veracity of a witness whom it was sought to impeach. [17] In ruling upon objections to offered evidence it is not improper for the judge to mention the fact to which the evidence relates, or to state the reasons for his ruling. Such remarks, although made in the presence of the jury, are not addressed to them and will not be presumed to influence their conduct. (8 Cal. Jur., p. 252.) [18] Moreover, upon the final submission of the case the court instructed the jurors to the effect that they were the exclusive judges of the evidence and of the credibility of the witnesses,

that it was their function to determine all questions of fact that the court had nothing to do with the facts, and that if it had said anything during the trial which might seem to indicate that it had an opinion upon any of the facts, such expressions should be entirely disregarded by them. This was sufficient to remove all apprehension that the remarks of the court would have any prejudicial effect upon the minds of the jurors. (*People* v. *Northey*, 77 Cal. 618 [19 Pac. 865, 20 Pac. 129]; *People* v. *Mayes*, 113 Cal. 618, 623 [45 Pac. 860].)

[19] It next is urged that the court erred in giving certain instructions and in omitting to give others. In a lengthy instruction defining murder and its degrees the court gave the customary and time-honored definition of murder in the first degree, in the course of which it is said: "There are certain kinds of murder which carry with them conclusive evidence of premeditation; these the legislature has enumerated in the code definition already given you, and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder in the first degree. These cases are of two classes: First: Where the killing is perpetrated by means of poison, etc. Here the means used is held to be conclusive evidence of premeditation. Second: Where the killing is done in the perpetration, or attempt to perpetrate, some one of the felonies enumerated in the statute, here the occasion is made conclusive evidence of premeditation." It is argued by counsel for appellants, with all seeming seriousness, that the use of the word "here" in the part of the instruction just quoted was calculated to mislead the jury and to convey the impression that the reference was to the case at bar. It is not possible to believe that the jury could have been so misled. We do not see how a juror of ordinary mentality—and jurors must be presumed to possess at least the average of intelligence—could have placed upon the instruction the interpretation of which appellants claim it is susceptible. It is as plain as a pikestaff that the word "here" was not intended as a reference to the case at bar, but to those circumstances which the statute makes conclusive evidence of premeditation.

[20] It is claimed that the court erred in not instructing the jury as to what constitutes the termination of a conspiracy and the effect of its termination upon the

admissibility of subsequent acts and declarations of a coconspirator. While it was the duty of the court to so instruct if requested by any of the defendants, the record discloses that no such request was made. The court's entire charge to the jury fills many pages of the record, and seems to have covered almost every conceivable phase of the case. If appellants deemed it essential to their protection to have the jury particularly charged upon the question as to when a conspiracy terminates, and the effect thereof upon the admissibility of subsequent acts and declarations of a co-conspirator, it was their duty to ask it. In the absence of such request they will be deemed to have been satisfied with the charge as given, and the omission will not be held error. For the same reason the failure to give a definition of the crime of robbery was not error. (See *People* v. *Rogers, supra.*)

A consideration of the record convinces us that the trial of these appellants was in all respects fair and free from any substantial error, and that as to them the verdict was fully justified by the evidence.

As to the two defendants who have appealed to this court, Pope and Williams, the judgment and the order denying a new trial are affirmed.

Works, J., and Craig, J., concurred.