[Crim. No. 1806. Second Appellate District, Division Two.—January 31, 1930.]

THE PEOPLE, Respondent, v. ASA KEYES et al., Appellants.

Milton Cohen, Paul W. Schenck and LeCompte Davis for Appellants.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

WORKS, P. J.—The defendants appeal from a judgment convicting them of the crime of conspiracy and from an order of the trial court denying them a new trial.

The indictment under which appellants were prosecuted charges them with a criminal conspiracy "to commit the crime of giving and offering a bribe in violation of the provisions of section 67 of the Penal Code, a felony, and the crime of asking, receiving and agreeing to receive a bribe in violation of the provisions of section 68 of the Penal Code, a felony. . . . " The pleading then alleges that during the times mentioned therein appellant Keyes was the district attorney of the county of Los Angeles, that there were pending in the Superior Court of the county three criminal actions, one against C. S. Lewis, Jacob Berman, *alias* Jack Bennett, appellant Rosenberg and others, the second against E. L. Rouse, appellant Rosenberg and others, and the third against Jacob Berman and others, and that appellant was charged with the duty of prosecuting the three actions.

The nature of the conspiracy—and it will be observed that but one conspiracy is mentioned in the language above quoted—is thus, with the omission of unnecessary verbiage, more specifically set forth in the indictment:

"That continuously throughout the period of time from about the first day of September, 1927, to the first day of September, 1928, . . . the said above named defendants . . . have conspired, combined, confederated and agreed together, and with each other, to commit the crime of giving and offering a bribe in violation of the provisions of section 67 of the Penal Code, a felony, and the crime of asking, receiving and agreeing to receive a bribe in violation of the

provisions of section 68 of the Penal Code, a felony, that is to say, that the said defendants then and there and continuously throughout said period of time . . . have conspired, combined, confederated and agreed together that he, the said Asa Keyes, . . . would ask, agree to receive and receive various and divers things of value and advantages and promises and undertakings to give things of value and advantages, and that the said defendants . . . [several defendants other than appellants are named in the indictment] would willfully, unlawfully and feloniously give and offer to give to him, the said Asa Keyes, various and divers things of value and advantages and promises and undertakings to give things of value and advantages, with a corrupt intent and upon the agreement and understanding that the action of him, the said Asa Keyes, as such district attorney . . . would be . . . influenced thereby, in that he, the said Asa Keyes . . . would control and direct the prosecution of each of said actions to the end that in so far as said actions related to any of said above named defendants E. H. Rosenberg . . . [and others] that said actions would be disposed of in such manner as to result in the discharge of such defendant [*sic*] without the conviction of such defendant [*sic*]."

It will be noted that, in the matter constituting the paragraph immediately preceding this paragraph, but one conspiracy is mentioned.

The indictment charges ten several overt acts performed in furtherance of the conspiracy. The facts concerning each of these acts are set forth in separate paragraphs, ten, of course, in number. The first of these paragraphs is preceded by the heading, "Overt Act No. 1." Each of the remaining nine is preceded by a similar heading, but with the number appropriate to it. It is charged in each of the ten paragraphs that the overt act referred to in it was committed "in pursuance of said conspiracy and to effect the object of the same." Here, then, are ten separate references to the single conspiracy pleaded in the earlier portions of the indictment.

Appellants contend that the pleading is duplicitous, that, indeed, it charges a conspiracy formed for the purpose of "giving and offering a bribe" and a second conspiracy for

the purpose of "asking, receiving and agreeing to receive a bribe." The pleading will bear no such construction. Its prefatory portion charges *a conspiracy* to do both sets of acts. The facts set up to exhibit more fully the nature of the charge exhibit a chain of events creating *a conspiracy*. Each of the ten overt acts pleaded in the indictment is charged to have been committed in pursuance of *a conspiracy*. The pleading is, therefore, not duplicitous.

Appellants also make the point that the indictment is insufficient for the reason that both sides in a programmed bribery, that is, both the prospective givers and the prospective takers, cannot in the very essence of things conspire to "give and offer" the bribe, and that, also, both the would-be givers and the would-be takers cannot conspire to "ask, receive and agree to receive" it. As the indictment before us makes no charge of separate conspiracies to do, respectively, these things, but a charge of a single conspiracy to do both sets of them, both points fall to the ground.

We now approach a more interesting question. It is insisted that a charge of conspiracy cannot grow out of the facts exhibited in the indictment. Appellants call attention to the undoubted truth that there are crimes which can be perpetrated only by two persons or two sets of persons acting on opposite "sides," to adopt our own terminology. Among these crimes are adultery, criminal rebating and bribery. It is said as to each of them, and of others like them, that a concord is necessary to its commission and that therefore the formation of a conspiracy to commit it is included in and swallowed up by the commission. Upon this postulate it is contended that a charge of conspiracy was impossible in the present instance and that the charge should have been bribery. This is certainly the law in some jurisdictions, under peculiar circumstances, however, which do not exist in California, the cases upon which appellants rely having been decided by the federal courts. The first of these is *United States* v. *Dietrich*, 126 Fed. 664, but the reason for the rule, so far as it is of interest here, is perhaps best stated in later decisions. In one of the cases the indictment charged "a conspiracy to commit an offense against the United States by inducing the giving and taking of a rebate." Under the federal statutes the crime of conspiracy is punishable more severely than the crimes of giving

and taking a rebate. With this circumstance in mind the court said: "If Congress has made a certain action an offense and prescribed its punishment, the courts cannot, by giving it some other name, increase the punishment" (*United States* v. *New York Cent. etc. R. R. Co.*, 146 Fed. 298). In a later case charging also a conspiracy to give and accept a rebate the court said, referring to another class of crimes for purposes of illustration: "It cannot be if the crime of bigamy be punishable in a certain way that the two parties who alone could commit it can be subjected to a charge of conspiracy for committing the same crime, and thereby made to suffer twice for exactly the same offense, or be subjected to a severer punishment on a conviction for the conspiracy than is imposed upon the substantive offense itself" (*Thomas* v. *United States*, 156 Fed. 897 [17 L. R. A. (N. S.) 720]).

The reasons for the rule in question, so far as they are valid, as stated in the language taken from these two federal cases, do not obtain in this state. It is not possible here to punish a man more severely under a charge of conspiracy to commit a particular crime than under a charge that he has committed the crime itself. If two or more persons "conspire to commit any felony, or to commit any act injurious to the public health, or to public morals, or tending to pervert or to obstruct justice, or the due administration of the laws, they shall be punishable in the same manner and to the same extent as in this code provided for the punishment of the commission of the said felony or act respectively" (Pen. Code, sec. 182). There is therefore room for the invocation here of the familiar maxim that where the reason for a rule ceases the rule itself ceases. We shall have more to say upon this subject below.

We have above referred to the "reasons for the rule in question, so far as they are valid," as stated by the United States courts. In employing this language we had in mind the expression in *Thomas* v. *United States, supra,* to the effect that one charged with conspiracy might be "made to suffer twice for exactly the same offense." We think this is not a valid reason. We cannot perceive how one charged with crime may be made to suffer twice "for exactly the same offense." The inhibition against double jeopardy would seem to forbid such a possibility. It is to

be observed—a circumstance which we have not yet mentioned—that the overt acts charged in the indictment here include acts which amounted to a commission of the very crimes which it is alleged that appellants conspired to commit. The first overt act alleged was the receipt by appellant Keyes, from one of the other defendants, of "a large sum of money, the exact amount of which is to the grand jury unknown, but which was approximately $10,000.00." Others of the ten paragraphs which set up the overt acts allege the receipt by appellant Keyes of articles of personal property. The eighth of those paragraphs charges that appellant Rosenberg "delivered to the said Asa Keyes a certain wrist watch of the value of about $600.00, lawful money of the United States." Under such an indictment for conspiracy as we have before us we have no doubt that appellant Keyes has been once in jeopardy upon a charge of receiving and appellant Rosenberg upon a charge of giving the bribes referred to in the list of overt acts. A charge of the substantive crimes against them, after a conviction of the crime of conspiracy under such circumstances, could hardly be allowed to stand in a court of justice. A conviction of either, hereafter, upon the substantive charge appropriate to him as distinguished from his coappellant would be a double punishment—it would be, to quote again from *Thomas* v. *United States,* a second punishment—for "exactly the same offense" as that upon which each has already been convicted—this for the reason of which appellants have attempted to make so much, that bribery, like adultery and duelling, itself involves in its very essence a concert of action upon the part of at least two participants in the offense. We have been pointed to no authority upon this question of jeopardy and we have made no search for such authority. The point seems plain enough to us without it.

In *United States* v. *New York Cent. etc. R. R. Co., supra,* the court quotes, without specific comment as to its applicability to the point under consideration, the following language of Chief Justice Cockburn in 12 Cox C. C. 93: "I am clearly of the opinion that when the proof intended to be submitted to a jury is proof of the actual commission of crime it is not the proper course to charge the parties with conspiracy to commit it; for that course operates, it is manifest, unfairly and unjustly against the parties accused.

The prosecutors are thus enabled to combine in one indict-ment a variety of offenses, which, if treated individually as they ought to be, would exclude the possibility of giv-ing evidence against one defendant to the prejudice of others.'' We infer that appellants rely upon this expres-sion in the English case, for they take from the opinion of the United States court a quotation which includes the language of Chief Justice Cockburn and they emphasize the latter by reproducing it in small capitals in the brief. We think, again, that the view of the English court affords no valid reason for the application of the rule of the federal courts in this jurisdiction. The form in which the indict-ment is cast no more involves "the possibility of giving evidence against one defendant to the prejudice of others" than would a charge against appellants of the substantive crimes they are here charged with conspiring to commit. [3] In this state, whatever the rule may be in England—and we have made no effort to ascertain its nature—a con-spiracy to commit any crime may be proven, under a charge directly of its commission, for the purpose of swelling the volume of testimony otherwise admissible in support of the charge. After such proof the testimony of any conspirator as to acts in furtherance of the conspiracy will be admissible against the defendant, he himself being a party to the illicit concord. This rule is so well established that we refer to but one case, a late one, in support of it. There two defendants were convicted of the crime of obtaining money by false pretenses. We said: "Counsel labor under the misapprehension that a conspiracy may not be proved to exist between two defendants for the purpose of establish-ing the fact that the act of one in furtherance of the con-spiracy is in legal contemplation the act of both and for which both may be convicted. They have the erroneous notion that when a conspiracy to commit a criminal act is shown to exist the conspirators may only be convicted of the criminal conspiracy and not of the crime actually com-mitted. Such is not the law. The books abound with cases where conspiracies have been proved and where the jury under appropriate instructions must have found, of neces-sity, the existence of a conspiracy in order to have returned a verdict of guilty as to one or more of the defendants. It is sufficient for our purposes to make reference to *People*

v. *Matthew,* 68 Cal. App. 95 [228 Pac. 417], *People* v. *Ferdinand,* 194 Cal. 555 [229 Pac. 341], and *People* v. *Seitz,* 100 Cal. App. 113 [279 Pac. 1070]." (*People* v. *Bryant,* 101 Cal. App. 83 [281 Pac. 404, 407].)

We conclude that the indictment is not subject to the assault which appellants make upon it. We have seen that all reasons for the rule adopted by the United States courts fall to the ground when it is sought to render the rule applicable here. It is therefore wholly proper to say that the rule itself "ceases" here—it can have no application in this state. We can see no substantial reason, upon any other ground, why it was not proper to cast the indictment in the form in which it rests. In effect it charges appellant Keyes with receiving and appellant Rosenberg with giving a bribe. ■ In the history of jurisprudence the time is come when courts are paying less and less attention, under a more enlightened system of legislation than that which has prevailed in former times, to technical rules of pleading which are invoked for the purpose of staying the administration of justice. No matter what the particular form in which the indictment against appellants is framed, it presents in sufficient substance the facts constituting a charge of giving and receiving a bribe. Appellants were tried upon the same evidence which might have been offered against them under the latter charge. Under the law, when they entered upon the trial of the charge as actually formulated, they saw before them a possibility of the same punishment which might have been inflicted upon a charge, with specific directness, of the substantive crime alleged in the list of overt acts to have been committed. They have not been harmed by the manner in which the indictment was drawn. We are bound to take the same liberal view here, in furtherance of justice, as was taken under not altogether dissimilar circumstances in *People* v. *Jordan,* 92 Cal. App. 543 [268 Pac. 373]. We think, further, that it can make no real difference whether the indictment be regarded substantially and actually as a charge of substantive crime or as a charge of conspiracy. We have referred to it as charging the former merely because a concert of action on the part of two "sides" is necessary to a completed giving and taking of a bribe and because the pleading shows such concerted action. It can as well and as safely be considered

substantially as what on its face it purports to be, a charge of conspiracy. By whatever name it is called the result is the same, and we are not concerned so much with form as we are with results.

Over objection the trial court received in evidence a letter to appellant Keyes from the chief deputy in his office. The criminal cases mentioned in the indictment were pending when the letter was written, and the deputy had been charged with the duty of handling them in the office. He refers to them in the letter as "the Julian cases." The communication reads: "I hereby resign as chief deputy district attorney because I do not care to be a party to the insincere prosecution of the Julian cases." The letter was admitted in evidence while its writer was on the witness-stand, and he had just detailed a conversation with appellant Keyes which had to do with the possible use of appellant Rosenberg as a witness for the prosecution in the pending cases. The witness said: "[W]e were discussing the Julian case, the preparation of it and trial of it, and I think the question of whether Mr. Rosenberg should be used as a witness came up, and Mr. Keyes stated that he believed that he needed him as a witness. That was the extent of that conversation regarding Mr. Rosenberg. I disagreed with him on it and that was the end of the discussion at that time." The witness also testified that after the letter had been received by appellant Keyes he and Keyes had a conversation during which the following transpired: "[Mr. Keyes] said that he would not take that resignation or any other resignation; that I could stay there and handle the case and stay chief deputy as long as I wanted. He said that he had made his suggestion relating to Mr. Rosenberg because he believed that his evidence was necessary. I told him that I felt that he was being made a goat out of . . . by some of his friends and particularly Mr. Dudley Robinson who represented Mr. Rosenberg, and that I did not want to be joined in with him. I reminded him that Mr. Robinson was getting a fee to represent Mr. Rosenberg and I felt that he was imposing on Mr. Keyes' long friendship. He said that it was not that and that I could continue in charge of the case."

It is contended that the court erred in receiving the letter in evidence, but we think the ruling admitting it was cor-

rect. The letter amounted to a charge that the "Julian cases" were not being sincerely prosecuted and the charge was in effect leveled at appellant Keyes, as he was the head of the office which rested under the duty of sincerely and effectively conducting the prosecution. The letter was important as laying a basis for a showing of the reaction which appellant Keyes exhibited to the charge and it is to be taken in connection with the assertion of the chief deputy that his superior was being made "a goat of" by the counsel of appellant Rosenberg. The district attorney did not deny that the prosecution of the cases was being insincerely conducted. He merely said that he would not accept the resignation of the chief deputy and that he had made the suggestion as to appellant Rosenberg "because he believed that his evidence was necessary." The situation is affected by the fact also that appellant Keyes later told the chief deputy that there would be no dismissals in the Julian cases, but that while the cases were on trial he said to the same witness that he would "make a motion for the dismissal of [appellant] Ed Rosenberg for the purpose of using him as a witness." The motion for a dismissal as to Rosenberg was actually made by him and it was by the court denied. We think the letter of the chief deputy was proper evidence under the rule stated in *People* v. *Mallon,* 103 Cal. 513 [37 Pac. 512], and in later cases which have followed that decision. The effect of what appellant Keyes said after the receipt of the letter was for the jury.

One of the defendants named in the indictment was one Ben Getzoff, and the paragraphs alleging the ten overt acts show, with the exception of the wrist watch delivered to appellant Keyes by appellant Rosenberg, that the money and articles of personal property which were received by Keyes were handed to him by Getzoff. Appellant Keyes offered evidence to prove that he believed Getzoff was a man of great wealth who, to quote the language of the brief filed by Keyes, was "well able to lavish favors upon his chosen friends." The prosecution offered upon this same issue a showing made by certain records of the county assessor's office. These books were to the effect that in 1925 Getzoff was assessed upon personal property of the value of $750 and paid a total tax of $11.70, that his name did not appear on the assessment-rolls for 1926 and 1927, and that in 1928

he was assessed upon personal property of the value of $800 and paid a tax of $13.45. It is insisted that this evidence was hearsay and also, apparently that it was inadmissible even if it were not hearsay. If the rulings admitting the evidence were error—and we do not decide that they were—we think the error was cured, perhaps we might even say that it was invited, by appellants themselves. The following occurred during a discussion of the question whether the evidence should be received: ''[Counsel for one of appellants:] And this book is not the evidence of his [Getzoff's] wealth. It is only evidence of the things that it bears on its face. It would be evidence that he was assessed for that much and that he paid so much without any further testimony, but it would not be evidence of the valuation of the man's property under any circumstances, because it was kept under the provisions of the law. [A Deputy District Attorney:] Why cannot we limit it to that then? Or why cannot we limit it to that and have the jury so instructed? [Same counsel for appellant:] It would only be introduced for the purpose that he paid those taxes but it would not have any relevancy to show how much he was worth and would not rebut anything that was said in his case at all. . . . Now let me ask what would be thought if your honor is asked to give that instruction, that this book is only worth that much and that he paid that much taxes, and they must presume therefrom that he didn't have any other property, must not presume that, and if that instruction was given then I think it would have to be given under those circumstances. What value would this evidence be then? How can the jury then go into a speculation, into a speculative field as to whether he had anything else? The Court: Well, it would merely show that Ben Getzoff had in Los Angeles property that was assessed to him originally. [Deputy District Attorney:] That is all. [Counsel for appellant:] It constitutes no proof that he had no more. The Court: No, it doesn't constitute proof that he had no more. It constitutes proof of that one thing. [Counsel for appellant:] That would be admitted by us that he had that property and that he was assessed for it, and if the court is going to give an instruction to the effect that it is proof of that and nothing else, I do not think it would do so much harm under the court's instruction, un-

der the proper instruction. [Deputy District Attorney:] All right. The Court: All right; call in the jury. [Counsel for appellant:] We do not, however, waive our objection. The Court: All right.'' ▮ The evidence would have been utterly harmless if the instruction mentioned had been given, as all present at the trial seem to have conceded, but it was not given. We think it was not incumbent upon the trial judge to give the instruction without a specific request for it, and it is clear to us that it should have been asked by appellants if, at the end of the trial, they still thought it necessary to their protection. The evidence was directed at appellant Keyes, and if it had any appreciable effect it was he who was injured by it. Under such circumstances it is clear to us that he should have reminded the court to give the instruction at the conclusion of the long and arduous trial which occurred. We think the objection to the evidence was waived at least, even though the counsel stated that they did not waive it.

▮ Jacob Berman, who was one of the defendants named in the indictment, had made a statement concerning the facts of the case and what he said was taken in shorthand and afterward transcribed. The statement was made in the presence of one who later became or who then already was a special prosecutor—and some question is raised as to this point—to conduct the instant case, and also in the presence of others, including two members of the grand jury. Berman was a witness for the prosecution and after his direct examination, during which the statement in question was not used, appellants demanded an inspection of the paper, the existence of which they ascertained on cross-examination. The prosecution refused to deliver it up and the trial judge refused to require its delivery. Appellants insist that this latter refusal was error. Appellants brought out the fact on the cross-examination of Berman that he had never signed the statement, and they do not in their brief refer to any place in the record which shows that he had ever seen it. A decision of the Supreme Court clearly disposes of the point now presented. We quote from the opinion, which was rendered in a murder case:

''The bell-boy, O'Connor, testified that he was an eyewitness to a part at least of the homicide, and related the circumstances. On cross-examination it was disclosed that

immediately after the homicide he was taken to the police headquarters and there made a statement to Captain Seymour, which was taken down at the time. The defense then demanded that the district attorney produce the statement referred to by the witness; whereupon the district attorney admitted that he had such a statement in typewriting, but refused to produce it. Application was then made to the court for an order requiring its production, but the court refused to make the order. The statement could not have been used in evidence, except for the purpose of impeaching the witness, by showing thereby that he had made statements out of court inconsistent with the testimony given by him on the trial. (Code Civ. Proc., sec. 2052.) The only statements that can be used for that purpose, if in writing, are statements made by the witness himself, either directly in his handwriting or over his signature, or indirectly by his adoption of, or admission of, the correctness of a written report of his statements made by some other person. He cannot be held responsible for a statement taken down by another purporting to be a report of his oral declarations, unless he has been made acquainted with the contents of such statement, and directly or indirectly admitted that it was correct. Inquiry as to the admissibility of such statements and as to the necessity of ordering their production is addressed to the court. Unless it is shown that there is good reason to believe that the document when produced would be admissible in evidence for some purpose in the case, the court need not compel its production. (*Ex parte Clarke*, 126 Cal. 235 [77 Am. St. Rep. 176, 46 L. R. A. 835; 58 Pac. 546].) There was testimony with relation to this statement from which the court could rightly conclude that the oral statements of the witness to Captain Seymour were taken down in shorthand, by a stenographer, and afterwards written out in longhand, and that the document in the possession of the district attorney, and which he refused to produce, was the longhand typewritten copy of the shorthand notes. There was nothing to show that the witness had ever read the statement or seen it, or that he was aware of its contents. This being the case, the statement could not be used for the purposes of impeachment, as a statement made by the witness and it was not error to

refuse to compel its production.'' (*People* v. *Glaze*, 139 Cal. 154 [72 Pac. 965].)

It is evident that it was not error here for the trial judge to refuse to compel the production of the alleged statement of Berman. It is contended by respondent that the statement was privileged under the provisions of subdivision 5 of section 1881 of the Code of Civil Procedure, and that for that reason a production of it could not be required. We find it unnecessary to decide this point, but, in view of the fact that the question may become of interest elsewhere, we refer to *Sloane* v. *Hammond*, 81 Cal. App. 590 [254 Pac. 648], as having a possible bearing upon it.

The witness Berman answered many questions inquiring for the circumstances leading to his presence on the stand as a witness for the prosecution. The appellants addressed five other questions to him and an objection to each of them was sustained. It is insisted that the trial judge erred in each of these rulings.

This was the first of the five questions: ''And you felt that if you did make a statement to the proper authorities, that that would redound to your own benefit and be for your own good, did you not?'' One of the objections to this question was that it had already been asked and answered, and the objection was sustained on that ground. Appellants do not show us that it had not been asked and answered. There was, therefore, no error in the ruling.

This was the second question: ''Now, in the Julian case, did you authorize your attorney, Mr. Donnelly of New York, to agree with the district attorney that if he would permit you to plead guilty to the first count of that indictment which charged conspiracy to obtain money by false pretenses, and dismiss the other counts, that you would testify for the prosecution, provided they would not object to a term of imprisonment in the penitentiary being made as short as it could be made or as the authorities could be induced to make it?'' This question was in effect answered by Berman at a later place in the record. The question also called for a privileged communication between client and attorney (Jones on Evidence, sec. 750). There was here no error.

The third and fourth questions also called for privileged communications and were therefore objectionable.

 This was the fifth question: "At the time you made the statement did you really expect to be tried on that charge?" The statement here referred to, as we learn from respondent's brief, was one made by Berman in the presence of his counsel and a deputy district attorney. The nature of the statement is not shown by appellants in their brief, nor do they even show to whom it was made. So far as we may gather from appellants' brief, then, the question asked is unintelligible. Quite naturally, there is nothing in respondent's brief to show that it was proper. If the question was a proper one, appellants have succeeded admirably in concealing the fact from us. We are, therefore, safe in saying that there was no error here.

 The following matter comprises one of the divisions of the brief of appellant Keyes:

"During the cross-examination of Mr. Berman and for the purpose of showing the effort of Mr. Keyes to apprehend him, the following questions were asked:

"Q. 'And you left rather suddenly, did you not, on May 2nd?' Q. 'Did you during that period (while he was away from May to September, 1927) ascertain that the district attorney and the authorities of Los Angeles county were looking for you in connection with the Julian matters?' Q. 'What parts of the world did you visit during that period?' Q. 'Well, the fact is, Mr. Bennett, is it not, that while you were in Europe you were dodging the law?' Q. 'You were doing everything you could while in Europe, and during the time you were in this country during that period, were you not, to avoid arrest?' Q. 'You ascertained at the same time (while in Europe), did you not, that the district attorney of Los Angeles county had detectives all over Europe who were following you and trying to capture you?' Q. 'During that period (after he returned to New York from Europe) you were doing everything in your power to avoid arrest and detection on indictment number 30741, were you not?' Q. 'Were you in hiding at that time?' The prosecution's objections to all of these questions were sustained by the court."

This portion of the brief is headed, "Errors in connection with rulings during the cross-examination of Mr. Berman to questions which sought to show his flight," but with heading and text together we are unable to determine

what questions of law counsel seek to present. There is neither argument nor citation of authority. In addition to these omissions, some of the questions included in the text of the brief are unintelligible, standing as they do. There is a failure to show us that there was error in sustaining the objection to any of these questions. We therefore say there was none.

A claim is made by appellants that the prosecutors were guilty of misconduct. A deputy district attorney was called to the witness-stand for the purpose of testifying to a certain conversation between himself and appellant Keyes. The witness was asked on cross-examination: "That accusation was the accusation provided for the purpose of removing officials charged with certain criminal matters?" The question was answered in the affirmative and it was followed by another: "The indictment referred to for the purpose of identification was the indictment charging Mr. Keyes with the crime of bribery, a substantive offense?" This question was also answered affirmatively. It is contended that the asking of the two questions was misconduct, on the ground, as it is asserted, that the jury was informed by them that appellant Keyes had been made the respondent under an accusation for his removal from office and had been indicted for an offense different from that under which he was being tried. Immediately preceding the two questions, the witness had been asked, for the purpose of fixing the time of the conversation: "State when that time is fixed?" To this question he had answered: "That was a day after the accusation was filed against Mr. Keyes and also the indictment which was subsequently dismissed and a new indictment found by the grand jury." Not only this, but no assignment of misconduct was interposed as to the asking of the two questions until after an objection to each was made, and neither objection was forthcoming until after the question to which it was applied was answered. In response to the assignment of misconduct the trial judge observed: "It seems to me the question was asked for the purpose of fixing the time. That is the only purpose which the jury must consider it for. It is not that it tends to a circumstance, but it is that he may refresh his memory as to the time some other event happened. The jury must disregard the question for any other purpose than that

limited purpose. You must not draw any inference of any kind from the question." Under all these circumstances, the claim of misconduct cannot avail appellants. It is quite important to note that the matter to which they take exception was placed before the jury by an answer of the witness made before the two questions were asked.

■ One Pike was called as a witness for the prosecution and gave testimony against the defendants. One McFadden was afterward put on the stand by the defendants and testified to a conversation between himself and Pike which tended to show an extreme and bitter feeling on the part of the latter against the defendant to whom his testimony had principally related. In rebuttal the prosecution called two witnesses who, after the proper foundation had been laid by questions addressed to McFadden, related statements by the latter which tended to show a bias on his part in favor of some of the defendants and particularly in favor of appellant Keyes. It is contended that this impeachment of McFadden was improper, and in presenting the point appellants cite many cases in support of the well known rule that a witness may not be impeached as to matters collateral to the issues being tried in a litigation. Strictly speaking, however, the question of the bias, interest or motive of a witness is not a collateral matter. First, we quote from a decision of the Supreme Court: "When, under cross-examination as a witness, the defendant, in response to a question of the district attorney, declared that he had not previously been convicted of a certain felony. Subsequently, against the objection of defendant, the district attorney was permitted to introduce the record of the conviction. It is a well settled rule that a witness cannot be cross-examined as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him by other evidence, if he should deny it, thereby to discredit his testimony. And if a question is put to a witness on cross-examination which is collateral or irrelevant to the issue, his answer cannot be contradicted by the party who asked him the question; but it is conclusive against him. But when the question asked on cross-examination calls for a response in respect to a matter which the party asking the question would have a right to prove as an independent fact, the rule does not apply. In the latitude per-

mitted by the law in cross-examinations, many questions may be asked which could not be allowed on direct examination, because relating to matter purely collateral. The Code of Civil Procedure (section 2051) allows the cross-examiner to ask a witness if he has been convicted of a felony, and does not confine the evidence of that fact—as was the rule before the Code—to the record of conviction. But by the same section the right to prove the fact, by the record of conviction, is continued. The law authorized the district attorney to prove by the record the conviction as a distinct fact. It was not one of those matters entirely irrelevant, which may be inquired into only by virtue of the wide latitude permissible on cross-examination, and was, therefore, not simply collateral within the meaning of the rule, which prohibits any other evidence than the statement of the witness on cross-examination'' (*People* v. *Chin Mook Sow,* 51 Cal. 597).

We call particular attention to the following sentence, contained in this quotation: ''But when the question asked on cross-examination calls for a response in respect to a matter which the party asking the question would have the right to prove as an independent fact, the rule does not apply.'' It is always proper to show the bias or intent of a witness as an independent fact. ''But the evidence containing the conversations between the witness LaForte and Mrs. McRea was not for the purpose of contradicting him as to the evidence he had given as to the facts of the case, but was for the purpose of showing his interest and bias in favor of the defendant on trial. That evidence tending to show the interest of a witness in the case may be given cannot be doubted, and evidence that a witness has endeavored to induce the prosecuting or any other witness to absent himself from the trial or to drop the prosecution of the case is clearly of such character. The bias and interest of the witness in the case is a matter going to the weight to be given to his testimony'' (*People* v. *Mack,* 14 Cal. App. 12 [110 Pac. 967]). We can see no reason why this rule should not be applied to an impeaching witness as well as to any other witness in a lawsuit. We think there was no error in admitting the questioned testimony.

Appellants insist that the district attorney was guilty of misconduct during the final argument of the cause

before the jury. Some of the language employed by him was intemperate, there is no question, but we doubt whether it was sufficiently strong to be characterized as misconduct. If, however, it was misconduct, we think it was cured by the admonition which the trial judge addressed to the jury concerning it.

It is contended that the evidence was insufficient, in several particulars, to support the verdict. Respondent directs our attention to portions of the record which are ample to uphold it as to every one of these particulars. We can see no useful purpose to be subserved in a repetition of the supporting evidence here.

Appellant Rosenberg makes a point which depends for its solution upon the question whether the evidence was sufficient to show that Getzoff and Berman were members of the conspiracy charged in the indictment, both having been named as defendants therein. The trial court received in evidence a telegram from Berman to Getzoff and it is contended that error was committed in its admission. The telegram was as follows, the "Ed" referred to in it being appellant Rosenberg: "Received wire from Ed saying that if I don't send you money you won't do anything. I don't want Ed sending threatening wires as any promises I make I will keep and do not want him interfering in my business relations with you stop I think he should keep some of the promises he made on it. You and I can take care of our own business stop he wired me he didn't owe you a cent." We think there was ample evidence to show the connection of Berman and Getzoff with the conspiracy. The wire was, therefore, properly received as a communication from one conspirator to another in and about the subject matter of the conspiracy.

Appellants make one or two other points which we think are not worthy of a specific consideration.

Judgment and order affirmed.

Craig, J., and Thompson, (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 13, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was

denied by the Supreme Court on February 27, 1930, and the following opinion then rendered thereon:

THE COURT.—In denying the petition for a hearing in this court after decision by the District Court of Appeal, Second Appellate District, Division Two, in the above-entitled cause, we deem it proper to say that we withhold our approval of so much of the opinion rendered as holds that in California, contrary to rulings elsewhere, an unlawful agreement between two parties, the one to give and the other to receive a bribe, may constitute a criminal conspiracy. It is true that a set of defendants may conspire to give or a set of defendants may conspire to receive or accept a bribe, but bribery requires for its consummation the unlawful concert of one or more persons acting with one or more other persons having a different motive or purpose. That being true, there is in such a case no room for the operation of a charge of conspiracy. In the indictment before us Rosenberg and his co-defendants, other than Keyes, are properly charged with a conspiracy to offer and give a bribe to said defendant, but as to defendant Keyes, himself, a criminal conspiracy cannot be properly charged. However, this fact is immaterial in view of the existence in said indictment of ample allegations showing an unlawful and felonious agreement on his part to accept a bribe from the other defendants, which is all that is required to charge the offense of bribery (Pen. Code, sec. 68).

In fact, to employ the language necessary to charge a conspiracy to violate said section is to charge the substantive offense thereunder. Then, too, as pointed out in the opinion, the punishment for the substantive offense and for conspiracy to commit it is, under the code, the same. The defendant has, therefore, suffered no substantial injury.

The petition is denied.

Langdon, J., dissented.