[L. A. No. 23779.   In Bank.   Dec. 30, 1955.]

BERNARD P. CALHOUN, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY et al., Respondents.

*Assigned by Chairman of Judicial Council.

Mahedy & Schall, John W. Preston and Charles H. Carr for Petitioner.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), Barton C. Sheela, Jr., and Jack R. Levitt, Deputy District Attorneys, for Respondents.

EDMONDS, J.—Bernard P. Calhoun was indicted by the grand jury which accused him of having conspired with others to commit certain acts in violation of the Elections Code. By this proceeding, he is endeavoring to prohibit the superior court from requiring him to stand trial upon these charges.

In count one of the indictment, Calhoun is alleged to have conspired with William G. Bonelli and others to commit the crime of soliciting, asking and receiving contributions from persons licensed by the Board of Equalization to sell alcoholic beverages. These contributions were solicited and received, it is charged, for use in campaigns for the reelection of Bonelli as a member of the Board of Equalization.

The second count asserts that Calhoun and Bonelli, with others, conspired "to do acts injurious to the public morals and to pervert and obstruct justice" (Pen. Code, § 182, subd. 5) in that they agreed together to use Bonelli's official position as a member of the Board of Equalization for their private gain by collecting funds from licensees and applicants for licenses from the Board of Equalization.

Other acts characterized as being contrary to section 182, subdivision 5, of the Penal Code are specified in count three of the indictment. In this count, Calhoun and Bonelli are charged with having agreed to prepare false papers and records for fraudulent purposes upon trials, proceedings and inquiries authorized by law.

Principally, the evidence presented to the grand jury pertains to contributions made by wholesale licensees and by retail licensees in San Diego and Los Angeles Counties. Similar operations were carried on in Orange, Riverside and San Bernardino Counties. This evidence, with the inferences reasonably to be drawn from it, shows the following pattern

of activity in San Diego County. Substantially the same plan was followed in the other counties.

In 1950 and 1954 Bonelli was a candidate for reelection to the Board of Equalization. Shortly before the 1950 campaigns, William Cook, who was "public relations man" for Bonelli, met with Charles E. Berry, Liquor Control Officer for San Diego and Imperial Counties. They discussed the idea of soliciting campaign contributions from retail liquor licensees. At their request Al Tossas, a former liquor salesman, agreed, for certain compensation, to take charge of work in making these solicitations. Berry, Cook, Frank Bompensiero and Ray McCullough assisted Tossas.

Tossas was furnished with "pretty thorough" lists of bars, liquor stores, markets, hotels, and similar establishments with a notation beside the name of the licensee as to the amount of the "contribution" expected from him. Following the "canned sales talk," Tossas would ask the licensee if he thought that Bonelli was "head of the liquor industry" and if it were not worth the amount specified on the list for him to have Bonelli reelected. The "contribution" almost invariably made was accepted with the understanding that it was to promote Bonelli's campaign.

Many of the licensees solicited had liquor violation charges then pending against them. Although Tossas was specifically instructed by Cook not to say that the contribution would affect the pending charges, those whose licenses were being questioned gave "more generously" than others.

Cook instructed Tossas to get a "certain amount" of cash. Checks were to be made payable to the National Democratic Club of California, the Aldine Printing Company, or the Woolever Press. A check, made payable to the Bonelli campaign fund, was not accepted. Some such checks were returned to the licensee with the request that it be made payable to one of the designated payees.

From time to time Cook told Tossas that a sufficient number of checks drawn in favor of one of the three designated payees had been received and that thereafter checks should be made out to one of the other payees. All cash and checks received by Tossas, which he estimated amounted to between $15,000 and $20,000, were turned over by him to Cook. There is no direct evidence as to how the payees obtained these checks but the record shows that they received some of them. Cook paid Tossas $1,500 as compensation for his services.

Early in 1954, Joseph Cannon set up campaign headquar-

ters in San Diego, the operation of which he later turned over to Dorothy Hall Jahant, who had done the same work in the 1950 campaign. Ray McCullough was placed in charge of obtaining contributions. Collections were made from licensees named in lists furnished to McCullough, "in the same manner" as in the 1950 campaign. McCullough was assisted by Girolamo Cusenza and Cannon. Some of the contributions obtained by them were made in cash. They also received checks made payable to one of them. These checks were cashed by them and the proceeds turned over to McCullough.

The record also shows that checks were received made payable to the National Democratic Club of California, the Aldine Printing Company, or the Woolever Press. A check from the Mexican Village, a liquor licensee, which had been made payable to the Bonelli campaign fund, was returned with directions to make it payable to one of the named payees. Other checks from liquor licensees, drawn in favor of the campaign fund, were received by Mrs. Jahant and turned over to Cannon or McCullough.

Approximately $8,000 was received by McCullough. Cash and checks received by him were placed in sealed envelopes and given to Mrs. Jahant for delivery to the National Democratic Club of California. She testified that she delivered one such envelope to the secretary of Nate Snyder, secretary-treasurer of the club, and one to Bonelli's secretary. Charles Berry testified that Nate Snyder was the person designated to receive contributions to that organization.

In the Long Beach area, members of the Long Beach Tavern Association collected contributions from licensees. The money was solicited for use in Bonelli's campaign and to defeat Proposition 3. These purposes were decided upon in tavern association meetings in which Albert Eisenberg, the association's attorney, acted as the representative of Bonelli. Contributions were made by checks made payable to the National Democratic Club of California, the Aldine Printing Company, the Woolever Press, and a fictitious company designated as the "Allied Printers" or "Allied Printing Company."

Nate Snyder described the National Democratic Club of California as an organization consisting of a board of directors who were its officers. Leonard Wilson was president; R. S. Sparks, vice-president; and Snyder, secretary-treasurer. According to Snyder, he had been authorized by the board to make disbursements to various candidates for political offices, largely in his own discretion. He was the only person author-

ized to write checks on the corporate account. The corporation, he said, did not solicit contributions. He testified that he had endorsed checks from retail liquor licensees but denied having paid out any money toward Bonelli's campaign except for advertisements for a slate of candidates which included Bonelli's name.

Leonard Wilson told the grand jury that only one week prior to the hearing was he told that he was president of the National Democratic Club of California. He had no knowledge of the functioning of that organization, he said; he had not authorized the use of his name as its president nor the expenditure of funds by Snyder and, as far as he knew, he had never been a member of the club.

With regard to contributions by wholesale licensees, the record shows these facts:

The Southern California Business Men's Association is a nonprofit organization of men in the hotel, restaurant, grocery, drug, distilled spirits, beer, wine, manufacturing and retail businesses. Dues are contributed regularly by its members. This money is expended for trade publications and similar purposes. Some political contributions are made, but they consist generally of printing in trade publications of slates of candidates endorsed by the association. At the times of the Bonelli campaigns, Calhoun was one of its 50 directors and Albert Weigel its executive vice-president.

Calhoun also is general counsel and "public relations man" for the Southern California Spirits Foundation, an association comprised of all but one of the major wholesale liquor distributors in the Los Angeles area. He had no authority to write checks on the Spirits Foundation account, but he was given *carte blanche* in the political use of its funds. He often received signed checks made out in blank. The association paid regular dues to the Business Men's Association.

At a meeting called by Arthur Samish in 1947, it was decided to establish a "Research and Public Relations Fund," to receive contributions for use in campaigns affecting the alcoholic beverage industry and to support some political candidates. Originally, this was a bank account of the Business Men's Association; later the account was also used by nonmembers as a depositary for contributions.

At first the expense of the campaign in opposition to a proposed business tax was paid from this fund. Later opposition to a tax on alcoholic beverages was financed from it. Money was generally collected, when a need was anticipated,

by dues levied against those participating in the maintenance of the fund.

In 1954, the association decided to reactivate the fund for use in opposition to Proposition 3 which was to be voted on in November. Because some members were reluctant to make payments until all had participated, their contributions were retained in a special account. However, during that year large deposits were made in the fund account. The bulk of them came from the Spirits Foundation, but several thousands of dollars were contributed by the California Brewers Institute and the Bohemian Distributing Company. These deposits were "directed" and "arranged" by Calhoun.

Five persons, including Calhoun and Weigel, were authorized to sign checks on the fund account, the signatures of any two of them being required. As a practical matter, however, Calhoun exercised complete control over the expenditure of the money. Generally, he would present a check to Weigel who signed it without inquiry as to its purpose. Substantial amounts were drawn by checks made payable to cash. Other checks, pursuant to Calhoun's instructions, were made out in payment of bills. Of the funds used, Calhoun could account for less than 10 per cent as having been used in connection with Proposition 3. As to other payments, he claimed the privilege against self-incrimination.

Records maintained by Weigel, however, showed that numerous checks were drawn on this account in payment of bills presented by the Woolever Press, the Civic Research Press, Aldine Printing Company and the Kennedy Outdoor Advertising Company for expenses in connection with the Bonelli campaign. Weigel pressed Calhoun for receipts showing the purpose for which cash withdrawals were expended. Several of the receipts given to him came from a book in the office of Bonelli.

On one occasion, the Aldine Printing Company billed the Southern California Business Men's Association for $3,000, as the charge for printing some booklets. When Weigel inquired of Calhoun concerning this bill he was told to write a check on the public relations fund for $1,500, which he did. Later, he received a bill for the balance of $1,507. When he again mentioned the matter to Calhoun, he was told to draw a check on the fund for $1,507 payable to himself as trustee. He did so and turned the cash over to Calhoun. Later, Calhoun presented a receipt from the Aldine Printing Company for that amount. The record shows, however, that this receipt did not represent a cash payment but was given

to acknowledge receipt of several small checks made payable to Aldine. It is a reasonable inference that these checks were from retail liquor licensees either in San Diego or Long Beach.

Harold Judson testified that Bonelli, by telephone, informed him that someone would visit him with regard to Proposition 3. Later Bonelli again telephoned to Judson about "the matter he had spoken about previously" and asked Judson if he would cash a check as an accommodation. Judson complied, giving Bonelli's messenger $5,000 for a check drawn on the account of the Southern California Spirits Foundation. A check made payable to James Garibaldi, as trustee, was handled in the same way. At Calhoun's request, a check for $5,000 on the account of the Spirits Foundation was cashed by Garibaldi's secretary and the proceeds delivered to Calhoun's messenger. The purpose of this check ostensibly was for work in connection with the campaign against Proposition 3.

The record shows that a major part of Bonelli's campaign printing and advertising was done by the Woolever Press, the Aldine Printing Company, the Kennedy Outdoor Advertising Company and George West. Describing the manner in which printing is provided for political campaigns, Charles Woolever, of the Woolever Press, testified that customarily someone guarantees a candidate's printing bill for a certain amount. Upon notification by the printer of the guarantee, the candidate orders specific work to be done. The bill is paid by campaign contributions either given directly to him from the contributor or furnished by the candidate.

In 1950, Bonelli's printing bill was guaranteed by the National Democratic Club of California; in 1954, his guarantors included the Southern California Spirits Foundation. Woolever and Bonelli agreed upon the printing to be done. Most of the bills were paid by checks of third persons made payable to Woolever.

Several checks were identified as those of retail liquor licensees in the Long Beach and San Diego areas delivered to Woolever by messenger. Some of these checks were applied to Bonelli's printing bills; others were cashed by Woolever, and the proceeds given to the messenger. According to Woolever, he knew that some of the money from checks he cashed was returned to Bonelli.

During the 1954 primary election campaign, Bonelli called Woolever to his office and presented to him a number of checks, aggregating about $2,300, made payable to the Woolever Press and the Allied Printing Company, a fictitious

company. These checks were cashed by Woolever at Bonelli's request and the money given to his messenger. Among the checks received by Woolever was one signed by Calhoun and Weigel drawn on the Research and Public Relations Fund.

Later Bonelli asked Woolever to set up a ledger account for printing work to be done during the general election campaign for the "Committee on Proposition 3." Woolever testified, however, that he did not do any printing in connection with Proposition 3. Instead, at Bonelli's request, he charged this account with three checks, aggregating some $4,100, payable to Leo Katcher, whom the record shows to have been the author of a book entitled "Billion Dollar Blackjack." The book was published by George West for the Civic Research Press, a company formed by Bonelli. As payment for these checks, Woolever was given checks aggregating some $1,275, payable to Woolever and written by third persons, about $1,000 in cash from Bonelli, and a check for $4,250 drawn on the account of the Southern California Spirits Foundation. At Bonelli's request, Woolever cashed the latter check, keeping $1,975 for himself and paying the balance to Bonelli.

Bonelli requested Woolever to bill some $4,414 worth of printing to the "Veterans Committee for Bonelli." As partial payment for this bill, in Bonelli's office, Calhoun gave Woolever a check for $1,000. A few days later, also in Bonelli's office, Woolever received from Calhoun a check for $500. Both checks were drawn on the account of the Research and Public Relations Fund.

Harold Feinstein, the proprietor of the Aldine Printing Company, testified that he had regularly done printing work in Bonelli's campaigns and required no guarantee. In 1950, such work was charged by him to an account in the name of Ed Levine, identified as having done solicitation work for Bonelli in Los Angeles County. On at least two occasions in that campaign, Feinstein furnished fictitious invoices to cover work paid for by a wholesale liquor licensee. In the 1954 campaigns, money to finance Bonelli's campaign printing was received by Aldine from the Republican Committee for Bonelli, the Spirits Foundation, the Research and Public Relations Fund and retail liquor licensees in San Diego and Long Beach.

George Kennedy testified that he first met Calhoun in 1950 in the personal office of William G. Bonelli. At that time they discussed Bonelli's entire outdoor advertising campaign for the primary election. A short time later Calhoun,

by telephone ordered certain advertising and directed him to charge the work to the National Democratic Club of California. Kennedy did so and his bill was paid by the check of that club.

Advertising for the 1954 general election campaign was contracted for in a similar manner. Bonelli discussed with him the various plans of coverage. Calhoun ordered the work and directed that it be billed to the Research and Public Relations Fund. Calhoun also decided to use some of the billboards for advertising Bonelli's book, the "Billion Dollar Blackjack." Kennedy put up the posters which he received. The only payment received by Kennedy for this work was a check for $1,500, drawn on the account of the Research and Public Relations Fund.

George West, a publisher, told the grand jury that he published Bonelli's book, the "Billion Dollar Blackjack." The nominal printer and publisher was the Civic Research Press, an individual proprietorship owned by Bonelli. Under their arrangement, West billed Bonelli for a certain amount, representing his cost of printing and profit. Bonelli paid a portion of the bill by his personal checks or cash. In addition, upon inquiry by West as to his bill, Bonelli called him to his office. Calhoun was present and either he or Bonelli gave West a check for $3,000 signed by Calhoun and drawn on the account of the Research and Public Relations Fund.

Wilbur Bassett testified that he was secretary-treasurer of the Los Angeles Allied Printing Trades Council, a trade union which published the "Southland Almanac." In 1954, the council was engaged in a labor controversy with the Los Angeles Times. Bassett asked Bonelli for a contribution and was promised $2,500. Payment was made by means of seven checks drawn by third persons to "Allied Printing," "Allied Printing Council" and "Allied Printing Co.," which were obtained by Bassett's messenger at Bonelli's office.

In support of his petition for a writ of prohibition, Calhoun urges that the evidence before the grand jury furnishes no reasonable basis for the charges against him. He also contends that the writ should issue because the trial judge expressed bias and prejudice against him in ruling upon his motion to set aside or quash the indictment. Finally, he attacks both section 5002.5 of the Elections Code[1] and

---

[1] "§ 5002.5. Solicitation or receipt of money, etc. from licensee or license holder. Any elective State officer who is authorized by law to issue licenses, or who is a member of any board or agency authorized to issue licenses, or any person seeking election to such office, board or agency, or any appointee or employee of such office, board or agency,

28

section 182, subdivision 5, of the Penal Code[2] as being unconstitutional.

Calhoun argues that section 5002.5 of the Elections Code creates an unreasonably narrow classification of persons from whom campaign contributions may not be solicited or received. There is no reasonable basis, he asserts, for setting licensees apart from other persons who might contribute to a political campaign.

In *Ex parte Curtis,* 106 U.S. 371 [1 S.Ct. 381, 27 L.Ed. 232], the court held constitutional a statute prohibiting certain federal officers and employees from giving political contributions to, or receiving them from, each other. "If contributions from those in public employment may be solicited by others in official authority," said the court, "it is easy to see that what begins as a request may end as a demand, and that a failure to meet the demand may be treated by those having the power of removal as a breach of some supposed duty growing out of the political relations of the parties." (P. 374; *cf. United States* v. *Wurzbach,* 280 U.S. 396 [50 S.Ct. 167, 74 L.Ed. 508] [holding constitutional a similar statute under which the defendant was indicted for receiving and being concerned in receiving specified sums in violation of it]; *United Public Workers* v. *Mitchell,* 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754] [holding the Hatch Act constitutional].)

Similarly, the Legislature might reasonably conclude that the same danger exists in the case of an elective officer empowered to issue licenses. What might begin as an innocent request or acceptance of a contribution from a licensee might ripen into a demand with which the licensee must comply in order to enjoy the privileges of his license.

Calhoun contends, however, that there is no reasonable basis for limiting the prohibitions of such a statute to elective state officers authorized by law to issue licenses. Similar dangers exist, he urges, in the case of any other elective officer having the power to favor one making a political contribution. Furthermore, he argues, the statute has been applied dis-

who directly or indirectly solicits, receives or agrees to receive any money or other thing of value, or any promise thereof, from any licensee named in, or any holder of, any license issued by such officer, board or agency, or from any agent of such licensee or license holder, for any political campaign of any person seeking election or reelection to the office, board or agency authorized to issue such license, is guilty of a misdemeanor.''

[2]Subdivision 5 makes punishable a conspiracy ''[to] commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.''

criminately in that there has been no previous prosecution under it.

Undoubtedly the statute is narrowly drawn and this fact may account for the absence of previous prosecutions under it. The Legislature, however, is free to recognize "degrees of evil" and deal with the ones which it deems most important. (*West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379, 400 [57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330]; *Tigner* v. *Texas*, 310 U.S. 141, 147 [60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321]; *United Public Workers* v. *Mitchell, supra,* 330 U.S. 75.) There is a reasonable basis for the conclusion that the danger of corrupt practice is greater in the case of the official having direct influence upon the right of the licensee to conduct his business than in other situations.

■ An indictment will not be set aside or a prosecution thereon prohibited if there is a rational ground for the conclusion that an offense has been committed and the accused is guilty of it. (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183-184 [281 P.2d 250].) ■ Discussing the requirements for a showing of probable cause in a prosecution for conspiracy, the court stated in the Bompensiero case, quoting from *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 57-58 [216 P.2d 859], " 'Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. "[I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole." ' " (P. 184.)

■ In attacking the sufficiency of the evidence to support count I of the indictment, Calhoun urges that it establishes only his participation as a donor, or the agent of a donor, in the making of contributions to Bonelli's campaigns. He relies upon the rule, to which this court referred in denying a petition for hearing in *People* v. *Keyes,* 103 Cal.App. 624, 646 [284 P. 1096], which precludes prosecution for conspiracy to commit a substantive offense when the only concert of action shown is that necessary to consummate the substantive offense. (*Gebardi* v. *United States,* 287 U.S. 112 [53 S.Ct.

35, 77 L.Ed. 206, 84 A.L.R. 370] ; notes, 26 So.Cal.L.Rev. 64, 70; 23 So.Cal.L.Rev. 262.)   There is little dispute, however, that the evidence shows an elaborate conspiracy to utilize contributions from both retail and wholesale liquor licensees to finance Bonelli's political campaigns.   Inferences which reasonably may be drawn from that evidence fully support the conclusion that Calhoun was connected with the general program of the Bonelli campaigns in other ways than solely as a donor to them.

The testimony of several witnesses places Calhoun in Bonelli's office directly dealing or negotiating with persons supplying printing or doing campaign work for Bonelli. Kennedy visited Bonelli's office and, at a few times, saw Calhoun there.   On Kennedy's first call, Calhoun and Bonelli discussed with him all of the outdoor advertising coverage to be used in the campaign.   Calhoun negotiated for billboard space and placed all of the orders with Kennedy for Bonelli's advertising.   In 1950, he directed Kennedy to bill the National Democratic Club of California for the work.   This is a direct link between Calhoun and the proceeds from solicitation of retail liquor licensees, for the evidence demonstrates that the club was a recipient of such contributions, and there is nothing to show that the Spirits Foundation was in any way connected with the club.   From that evidence, a reasonable grand juror would be justified in drawing the inference that Calhoun knew that the club would be receiving funds to be made available to Bonelli, and the source of such funds. Other testimony placing Calhoun in Bonelli's office included that of West and Woolever, each of whom received a check from Calhoun for services rendered for Bonelli.

Other evidence connecting Calhoun with retail licensee contributions includes the testimony of Weigel and Feinstein regarding the transaction by which Calhoun obtained a fictitious receipt to cover his cash withdrawal of $1,500.   That he could obtain a receipt for checks received from retail liquor licensees is reasonable ground for an inference that he had knowledge of the manner in which Bonelli's printing from Aldine was being financed.   Also, Woolever said that he told only Bonelli of the balance owing on his 1954 primary election bill, but he was paid in full by a check directly traceable to Calhoun which exactly closed out the account.   This evidence indicates a much more intimate participation in Bonelli's campaigns than that of one who acted solely as a donor.

The indictment also might be based upon the use of the funds of the Spirits Foundation and those deposited in the

Research and Public Relations Fund. The grand jurors reasonably might conclude that all of the major liquor distributors in the Los Angeles area would not acquiesce in the use of their funds for an unlawful purpose and that Calhoun, in using them for the purpose of Bonelli's campaigns, acted as his agent rather than for the association. Furthermore, several thousands of dollars, in addition to those received from the Spirits Foundation, were deposited in the Research and Public Relations Fund by wholesale liquor licensees of whom Calhoun was not an agent. This is direct evidence that Calhoun "received" money for Bonelli's campaign and from his intimate participation in Bonelli's campaign it is a reasonable inference that he acted in concert with Bonelli in doing so.

There is no merit in the contention that subdivision 5 of section 182 of the Penal Code is unconstitutional. The constitutionality of this statute was expressly upheld in *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 59-61 [216 P.2d 859], and *People* v. *Sullivan,* 113 Cal.App.2d 510, 519 [248 P.2d 520]. And, contrary to Calhoun's contention, full consideration was given to the decision in *Musser* v. *Utah,* 333 U.S. 95 [68 S.Ct. 397, 92 L.Ed. 562]. (See *People* v. *Sullivan,* at pp. 522-523.)

The evidence is amply sufficient to support the charges alleged in counts II and III. There is ground for an inference that Bonelli and Calhoun acted in concert to use Bonelli's position for their private gain in the Judson and Garibaldi transactions. In the former, a Spirits Foundation check payable to Judson and, it may reasonably be inferred, drawn by Calhoun or at his direction, was cashed and the proceeds delivered to Bonelli's messenger. Similarly, in the Garibaldi transaction Calhoun received cash from a check ostensibly made to aid the opposition to Proposition 3, which has not been accounted for. Other cash withdrawals made by Calhoun from the research fund depend upon his statements as to their use or receipts supplied by him. Some of the receipts came from a book in Bonelli's office and one, from the Aldine Company, was shown to have been given for a purpose different from that represented. In several instances, checks from the Spirits Foundation or the Research and Public Relations Fund traceable to Calhoun were cashed by Bonelli, or used to pay expenses incurred in connection with his book. Also, on many occasions Bonelli cashed retail licensee checks, and, although Calhoun is not directly linked

to these transactions, it reasonably might be concluded that they were a logical outgrowth of the conspiracy.

■ Supporting the charge that Calhoun and Bonelli conspired to prepare false papers and records is the evidence as to the Aldine receipt, setting up by Woolever of fictitious ledger accounts to evidence funds received from Bonelli and Calhoun, the checks given to the nonexistent Allied Printing Company, the substitution of a new check for that made out by the Mexican Villege to Bonelli's campaign fund, Calhoun's use of the Research and Public Relations Fund as a channel for remittances from the Spirits Foundation, the transactions in the name of the National Democratic Club of California, and other activities which, a reasonable grand juror might infer, were done with the intent to disguise their nature.

■ The contention that the trial judge was biased against Calhoun in ruling upon his motion to set aside the indictment does not affect the legal sufficiency of the evidence to justify the indictment insofar as it concerns the present petition. If, at the time of trial, Calhoun believes that he will not be able to obtain a fair and impartial hearing, he may present his objections in the manner specified in section 170 et seq. of the Code of Civil Procedure.

The alternative writ is discharged and the peremptory writ is denied.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Because of the misleading statements and inferences contained in the majority opinion, I find it necessary to restate the facts here involved and to demonstrate that the majority has in every instance gone out of its way to "draw" not only the inferences most compatible with guilt but has manufactured inferences which it uses as a foundation for layer after layer of more manufactured inferences until the entire shaky structure collapses of its own weight. The unfortunate result of the collapse is that a man, innocent of the crime with which he was charged, must stand to answer in a criminal court. To anyone who has read and studied the entire lengthy record in this case as I have done, the reason for the so-called inference drawing is obvious—Calhoun *must* be held to answer and even though all that is necessary is a "strong suspicion" of guilt that suspicion had to be created out of whole cloth.

Many unfounded statements are made in the majority opinion. The following admission in the majority opinion shows conclusively the falsity of the conclusion that Mr. Calhoun was guilty as charged: ''Principally, the evidence presented to the grand jury pertains to *contributions* made by wholesale licensees and by retail licensees in San Diego and Los Angeles Counties. Similar operations were carried on in Orange, Riverside and San Bernardino Counties. This evidence, with the inferences reasonably to be drawn from it, shows the following pattern of activity in San Diego County. . . .'' The charge against Calhoun was that of solicitation, *not* contribution. All of the facts stated in the majority opinion have to do with solicitation of liquor licensees by Bonelli and others. *This* case deals *only* with Calhoun. Before the conclusion of the grand jury may be upheld by this court, something must be found which ties Calhoun in with the program of solicitation carried on by Bonelli. I will show, conclusively, that while the majority opinion rambles on and on incoherently with facts proving *Bonelli* guilty of solicitation, there is nothing whatsoever in the record showing that Calhoun conspired with him in that program of solicitation.

Petitioner was accused by the grand jury of three counts of conspiracy. Count One accused him of the crime of conspiracy to violate section 5002.5 of the Elections Code in that he, together with William G. Bonelli, and certain others, did ''wilfully, unlawfully, feloniously combine, conspire, confederate, and agree together to commit the crimes of soliciting, asking and receiving cash political contributions and contributions of things of monetary value from persons who were named in licenses to sell alcoholic beverages issued by the Board of Equalization of the State of California, said Board being duly authorized to issue said licenses; and to solicit, ask and receive cash contributions and contributions of things of monetary value from holders of licenses to sell alcoholic beverages issued by the Board of Equalization of the State of California, said Board being duly authorized to issue said licenses, for the use in campaigns for re-election of William G. Bonelli as a member from the Fourth District of the Board of Equalization of the State of California at times when William G. Bonelli was then and there a duly elected and duly authorized member of the Board of Equalization of the State of California.'' In the second count, petitioner was charged with conspiring with William G. Bonelli, and others, in that

they did "wilfully, unlawfully, feloniously combine, conspire, confederate and agree to do acts injurious to the public morals and to pervert and obstruct justice and the due administration of the laws; whereas the said WILLIAM G. BONELLI from January, 1938, until December, 1954, was . . . the duly elected member of the Board of Equalization, Fourth District, of the State of California; that while acting as such member of the Board of Equalization the said WILLIAM G. BONELLI at the official meetings of the duly elected Board of Equalization and in his official capacity presented matters for the consideration of and made recommendations to the Board of Equalization in matters pertaining to the official duties of the Board of Equalization; the said WILLIAM G. BONELLI, BERNARD F. [sic] CALHOUN . . . did wilfully, unlawfully, feloniously combine, conspire, confederate, and agree together to use the said William G. Bonelli's official position of membership of the Board of Equalization . . . for the private gain of said co-conspirators in that said defendants and their co-conspirators did agree among themselves that they would unlawfully collect funds from licensees and applicants for licenses of the Board of Equalization for the private gain of William G. Bonelli . . . and for the private gain of all said defendants and co-conspirators." Count Three charges petitioner, William G. Bonelli, and others, "of the crime of Conspiracy to do Acts Injurious to Public Morals and to Pervert and Obstruct Justice and the Due Administration of the Laws (Penal Code 182, subd. 5) committed as follows: The said William G. Bonelli and Bernard P. Calhoun [and others] did wilfully, unlawfully, feloniously combine, conspire, confederate and agree together to prepare misleading, false and deceitful papers, records and instruments in writing, with the intent to allow the same to be produced for fraudulent and deceitful purposes upon trials, proceedings and inquiries authorized by law, for the purpose of perverting and obstruction [sic] justice and the due administration of the law."

It appears that this matter as it relates to petitioner must turn on a construction of section 5002.5 of the Elections Code which provides:

"Any elective State officer who is authorized by law to issue licenses or who is a member of any board or agency authorized to issue licenses, or any person seeking election to such office, board or agency . . . who directly or indirectly solicits, receives or agrees to receive any money or other thing of value, or any promise thereof, from any licensee

named in, or any holder of, any license issued by such officer, board or agency . . . for any political campaign of any person seeking election or reelection to the office, board or agency authorized to issue such license, is guilty of a misdemeanor.''

Section 182, subdivision 5, of the Penal Code, contains the conspiracy statute, and makes criminal a conspiracy ''To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws.''

Petitioner is not a state officer of any kind; he is an attorney at law. For many years petitioner has been retained by the Southern California Spirits Foundation as executive secretary, general counsel, labor relations advisor, and public relations man. The Southern California Spirits Foundation, hereinafter called Spirits Foundation, is a trade association whose membership consists of all but one of the persons, or corporations,* engaged in the wholesale liquor business in southern California. Spirits Foundation, together with Southern California Business Men's Association, another group of those interested in the liquor business, and hereinafter called Business Men's Association, have, for many years participated in various political campaigns where issues of interest to the industry were involved. These two groups have, throughout the years, contributed sums of money to defeat measures thought to be inimical to the welfare of the liquor industry, and to promote measures thought to be for its best interests. They have, also, contributed sums of money for the campaigns of various political candidates for local, county, state, and federal offices.

The members of Spirits Foundation were, as has been previously stated, those engaged in the wholesale liquor business in southern California. These persons voluntarily associated together for their mutual benefit. Dues were paid on a monthly basis and were computed on a gallonage sold basis. The dues' computation was made as the gallonage was reflected in the members' tax statements to the State of California and a 1 per cent or, later, a 1½ per cent assessment made thereon. Statements of dues owed were mailed each month to each member of the Foundation. The avowed purposes

---

*The one wholesaler not a member is a distillery. This distillery desired membership but was not acceptable to the Foundation as a member because it either sold direct to the retailers or desired to do so. This procedure would eliminate the wholesaler.

of the Spirits Foundation were as heretofore set forth: to contribute funds to oppose inimical legislation; to promote favorable legislation; to aid financially in the campaigns of various candidates for divers public offices; to handle tax matters and litigation for the various members, both individually and collectively, when it affected the group as a whole. A reading of the record shows that petitioner attended all Board of Equalization meetings; that he was frequently in Sacramento; that he had copied lists of all rules, regulations, laws, relating to the industry, and changes therein, and sent these copies to the members of Spirits Foundation. The record shows that Mr. Calhoun was given *carte blanche* permission to make the necessary decisions regarding the disbursement of Spirits Foundation funds in line with the objectives to be achieved. It is also shown that members of Spirits Foundation met together several times each month.

The Southern California Business Men's Association is an organization of business men who are in the hotel, restaurant, grocery, drug, distilled spirits, beer, wine and manufacturing businesses. It appears to be a trade association of representatives from all the diverse branches of the liquor industry, or businesses having any connection therewith. It was organized originally for the purpose of assisting in the repeal of the Eighteenth Amendment and has, ever since, acted as a coordinating agency of the people represented in the alcoholic beverage industry. Its source of funds is membership dues and assessments, or contributions made by the regular membership. The association issues slates of recommended candidates and publicizes the recommendations to its membership and others. Spirits Foundation is a regular member of the Business Men's Association in its function as representative of the wholesale liquor dealers. Petitioner is a director of Business Men's Association. Business Men's Association was also interested in legislation affecting the interests of its membership and had special funds set up with which to oppose, or advocate such legislation, depending on its effect on the industry. Albert V. Weigel acted as executive vice president and secretary of the association.

Research and Public Relations Fund was a fund that had been established for a number of years prior to the ones under consideration and had been set up to take care of matters affecting the liquor industry as they were reflected in legislation and to support candidates for various public offices. Prior to 1954, however, the Fund had been inactive, although

a small balance had been carried over from year to year. In 1954, the Fund was reactivated primarily for the purpose of defeating Proposition 3 at the general election of that year. Although five persons were authorized to sign checks thereon, each check requiring two signatures, only petitioner and Mr. Weigel signed the checks drawn on this account. During 1954 practically all of the monies in the Fund were transferred to it from Spirits Foundation.

The record shows that the members of Southern California Business Men's Association agreed at a meeting between themselves upon a budget they considered necessary for the defeat of Proposition 3. Some of the members were not willing that any of these monies be used for that purpose until all contributions were in and the budget completed. Mr. Calhoun testified that it was for this reason, as well as for other reasons of convenience, that funds from Spirits Foundation were transferred to the Fund. Mr. Calhoun testified as an additional reason for the transfer of funds and use of the Research Fund that he did not sign checks drawn on Spirits Foundation although he directed the expenditure of its funds. The checks were signed by two officers of the Foundation and many times one or the other of these officers was unavailable; sometimes one or the other of these officers would sign checks in blank, so that if he happened to be out of town, the check would require only the one additional signature.

The record shows from a question or statement made by Mr. Sheela, Deputy District Attorney, to a witness that the grand jury proceedings were had on the theory that it was unlawful for a licensee to contribute, however voluntarily, to the campaign of any member of the board issuing the license. Mr. Sheela made this statement to a witness: ". . . I will tell you simply, you understand our problem, it is against the law for any liquor licensee to *contribute* to the campaign of Mr. Bonelli. . . ." The pattern was set— that the prohibition of this statute extended to the donor as well as the donee.* Since there was ample evidence that Mr. Calhoun's organization contributed to Bonelli's campaign, it is obvious that the grand jury could have been, and undoubtedly was, under the impression that Mr. Calhoun was

---

*While section 5002.6 of the Elections Code prohibits a licensee from making a contribution to the political campaign of a person seeking election to the "office, board or agency authorized to issue such license," this section is not involved here.

accused of such contributions in violation of section 5002.6 of the Elections Code. This was not the case—he was charged with conspiracy to solicit—not to give.

The entire record deals with Bonelli and his program of solicitation from retail liquor licensees and inasmuch as the jury was informed that it was against the law for any liquor licensee to contribute, it is obvious that Mr. Calhoun was caught in the gigantic net spread to catch those soliciting when he, in truth and in fact, only donated—a crime with which he was *not* charged. The theory of the prosecution could only have had the effect of causing untold confusion in the minds of the jurors and to make it now impossible to ascertain whether the grand jury considered him guilty of conspiracy to solicit or to give. Petitioner here claimed his constitutional provilege against self-incrimination when questions were asked him concerning Mr. Bonelli, or his campaign. He also refused to answer questions concerning S. Ernest Roll, District Attorney of Los Angeles County, the Honorable Goodwin J. Knight, Governor of California, and Attorney General Edmund G. Brown.

There is not one scintilla of evidence in the record that the association of wholesale liquor dealers in Spirits Foundation was other than voluntary; there is absolutely no evidence which would show, or even tend to show, that Spirits Foundation was organized at the instance of Mr. Bonelli, or Mr. Calhoun, either singly or together, for any purpose. There is nothing in the record to show that the funds received by Spirits Foundation were given other than voluntarily, or that they were anything more than previously agreed upon membership dues of that association which had certain, definite objectives to be achieved for the common good of the members. There is also no evidence in the record that petitioner used the funds except as the membership intended they be used. Justice Edmonds states, however, that "The indictment also might be based upon the use of the funds of the Spirits Foundation and those deposited in the Research and Public Relations Fund. The grand jurors *reasonably might conclude that all of the major liquor distributors in the Los Angeles area would not acquiesce in the use of their funds for an unlawful purpose and that Calhoun, in using them for the purpose of Bonelli's campaigns, acted as his agent rather than for the association."* If the grand jury so inferred, then it was guilty of the wildest possible speculation.

During the 1954 campaign a considerable amount of money was contributed toward the campaigns of a number of indi-

viduals running for various public offices by paying portions of their campaign bills. There is evidence which shows that certain printing bills incurred by Mr. Bonelli, or those working in his behalf, were paid by checks drawn on Spirits Foundation and the Research Fund; there is also evidence that a bill for billboard advertising for Mr. Bonelli's campaign and his book were paid by a check drawn on the Research Fund or on Spirits Foundation; there is evidence that Spirits Foundation defrayed part of the cost of printing Mr. Bonelli's book. There is evidence that petitioner was seen in Mr. Bonelli's office but there is no evidence that he was there other than on business for Spirits Foundation. Justice Edmonds makes much of the fact that Calhoun was seen in Bonelli's office and that he paid some of Bonelli's campaign expenses from that office with Spirits Foundation funds. In my opinion, the only inference to be drawn therefrom is that wholesale liquor money was being donated to pay those expenses—a crime, again, with which Calhoun was not charged. There is no evidence that Mr. Bonelli received any direct cash contributions from these two funds, or that Mr. Calhoun received any money for personal use other than his salary from the Foundation.

The statute (Elec. Code, § 5002.5) prohibits any elective state officer authorized by law to issue licenses from directly, or indirectly, soliciting, receiving, or agreeing to receive money or any other thing of value, or any promise thereof, from any licensee, for any political campaign. The statute was designed to prevent the exercise of coercion by those having the power to issue, or withhold, licenses upon those desiring them. Its construction should be no greater than necessary to subserve the purpose sought to be achieved (*Gebardi* v. *United States*, 287 U.S. 112, 123 [53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370]). A statute should be construed with reference to its purpose and the evils to be cured thereby (14 Cal.Jur.2d § 105, p. 312; *People* v. *Jackson*, 24 Cal.App.2d 182, 198 [74 P.2d 1085]). Moreover, since the statute under consideration is also a criminal one, the one accused of its violation is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, or as to the true interpretation of language used therein. (*Ex Parte Rosenheim*, 83 Cal. 388, 391 [23 P. 372]; 14 Cal.Jur.2d § 104, p. 310; *Downing* v. *Municipal Court*, 88 Cal.App.2d 345, 349 [198 P.2d 923]; *People* v. *Ralph*, 24 Cal.2d 575, 581 [150 P.2d 401]; *People* v.

*Valentine,* 28 Cal.2d 121, 143 [169 P.2d 1]; *People* v. *Showalter,* 126 Cal.App. 665, 669 [14 P.2d 1034]; *In re McVickers,* 29 Cal.2d 264, 278 [176 P.2d 40]; *In re Bramble,* 31 Cal.2d 43, 51 [187 P.2d 411].)

It should be noted here that this statute prohibits only the soliciting, receiving, or agreeing to receive money, or its equivalent. It does not prohibit an individual licensee, or group of such licensees, from voluntarily contributing to such official campaign. This court, in construing such a statute, should not engraft thereon a provision which the Legislature in its wisdom did not see fit to include when enacting the measure (*Gebardi* v. *United States,* 287 U.S. 112, 123 [53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370]) or extend it by implication (*In re Straut,* 125 Cal. 415, 417 [58 P. 62]; *Daman* v. *Hunt,* 47 Cal.App. 274, 280 [191 P. 376]; *Bagley* v. *Ward,* 37 Cal. 121, 133 [99 Am.Dec. 256]; *Weimer* v. *Lowery,* 11 Cal. 104, 112; *Burdge* v. *Underwood,* 6 Cal. 45; *Chapman* v. *Aggeler,* 47 Cal.App.2d 848, 853 [119 P.2d 204]; *Hossom* v. *City of Long Beach,* 83 Cal.App.2d 745, 757 [189 P.2d 787]). Penal statutes must be construed to reach no further than their words; no person can be made subject to them by implication (*DeMille* v. *American Fed. of Radio Artists,* 31 Cal.2d 139, 156 [187 P.2d 769, 175 A.L.R. 382]) and a penal statute may not, under any rule of construction, be so read as to reach further than its words (*In re Twing,* 188 Cal. 261, 265 [204 P. 1082]; *Ex parte Kohler,* 74 Cal. 38, 44 [15 P. 436]; *People* v. *Tisdale,* 57 Cal. 104, 107; *Eustace* v. *Jahns,* 38 Cal. 3, 19, 21).

Petitioner was charged with ''soliciting, asking and receiving cash political contributions'' from holders of liquor licenses. I find nothing in the record to substantiate this charge other than his own statement that as executive secretary of a trade association he billed members of his association for their dues. Before petitioner can be tried under this statute the evidence must show that he conspired with Mr. Bonelli, a state elective official, and others, to solicit funds from holders of liquor licenses.

In viewing this statute I find, then, that it does not prohibit the giving, but only the receiving, of campaign funds from licensees. It has been held in numerous cases that conspiracy requires, as an essential element, a concert of action of two or more persons.

The rule that conspiracy will not lie where the commission of the substantive offense requires a concert of action has

been recognized in the following cases: *United States* v. *Katz* (illegal liquor sales), 271 U.S. 354 [46 S.Ct. 513, 70 L.Ed. 986]; *Vannata* v. *United States* (recognizing rule but holding it inapplicable under facts), 289 F. 424; *Robilio* v. *United States* (liquor transportation; recognizing rule but holding it inapplicable under facts), 291 F. 975 (cert. den. 263 U.S. 716 [44 S.Ct. 137, 68 L.Ed. 522]); *Lisansky* v. *United States* (making false partnership income tax return; rule recognized, but held inapplicable), 31 F.2d 846, 67 A.L.R. 67 (cert. den. 279 U.S. 873 [49 S.Ct. 514, 73 L.Ed. 1008]); *Norris* v. *United States* (transportation of liquor), 34 F.2d 839; *United States* v. *Sager* (bribery), 49 F.2d 725; *Ex parte O'Leary* (bribery), 53 F.2d 956; *Curtis* v. *United States* (rule recognized, but held inapplicable under facts), 67 F.2d 943; *People* v. *Wettengel* (bribery), 98 Colo. 193 [58 P.2d 579, 104 A.L.R. 1423]; *Commonwealth* v. *Carroll* (statutory rape), 8 Pa.D.&C. 271; *Commonwealth* v. *Bricker* (abortion), 74 Pa.Super. 234; *Commonwealth* v. *Maxberry* (receiving stolen goods), 13 Pa.D.&C. 371; *United States* v. *Dietrich* (bribery), 126 F. 664; *United States* v. *New York Cent. & H. R. R. Co.* (illegal rebate), 146 F. 298.

In the present case, as in the Gebardi case, if conspiracy is held to lie, the very immunity granted by this statute is, by implication, withdrawn.

In addition to the necessity for a concert of action, and closely allied thereto, in conspiracy cases it is necessary that there be a joint intent and common purpose among those accused of conspiracy to commit a crime or achieve an unlawful end (*People* v. *McManis*, 122 Cal.App.2d 891, 900 [266 P.2d 134]; *People* v. *Yeager*, 194 Cal. 452, 484 [229 P. 40]; *People* v. *Griffin*, 98 Cal.App.2d 1, 43, 44 [219 P.2d 519]; *People* v. *Montgomery*, 47 Cal.App.2d 1, 11 [117 P.2d 437]; *People* v. *Eiseman*, 78 Cal.App. 223, 244 [248 P. 716]; *People* v. *Allen*, 104 Cal.App.2d 402, 414 [231 P.2d 896]; *People* v. *Steccone*, 36 Cal.2d 234, 236 [223 P.2d 17]). Taking this element into consideration, it is doubtful that petitioner could, under the facts here presented, have conspired with Mr. Bonelli to receive campaign contributions. In an article in 26 Southern California Law Review, 64, 70, (Criminal Law—Conspiracy and Conspirators in California) it is said: "Conspirators reach an agreement with a common intent and purpose in mind. This concert of purpose is a necessary element of the crime. There are a number of crimes which two parties can *agree* to commit, but which they cannot *conspire*

to commit, since they enter the agreement with different objectives. Bribery, adultery, bigamy and subordation of perjury are crimes of this class. [Note, 104 A.L.R. 1430 (1936).] Two parties may conspire to *give* a bribe [*People* v. *Griffin,* 98 Cal.App.2d 1, 219 P.2d 519 (1950)).]; they may conspire to *accept* a bribe [*People* v. *Savage,* 15 Cal.App.2d 72, 59 P.2d 190 (1936).]; they may *commit* bribery, one giving and one accepting [*People* v. *Sheffield,* 108 Cal.App. 721, 293 P. 72 (1930).]; but they cannot *conspire* to commit bribery, one to give and one to accept. [*People* v. *Keyes,* 284 P. 1105 (Cal. 1930), in denying rehearing [sic] on 103 Cal. App. 624, 284 P. 1096.]''

In *People* v. *Keyes,* 103 Cal.App. 624, 646 [284 P. 1096], this court, in denying a hearing, had this to say: ''In denying the petition for hearing in this court after decision by the District Court of Appeal, Second Appellate District, Division Two, in the above-entitled cause, we deem it proper to say that we withhold our approval of so much of the opinion rendered as holds that in California, contrary to rulings elsewhere, an unlawful agreement between two parties, the one to give and the other to receive a bribe, may constitute a criminal conspiracy. It is true that a set of defendants may conspire to give or a set of defendants may conspire to receive or accept a bribe, but bribery requires for its consummation the unlawful concert of one or more persons acting with one or more other persons having a different motive or purpose. That being true, there is in such a case no room for the operation of a charge of conspiracy. In the indictment before us Rosenberg and his codefendants, other than Keyes, are properly charged with a conspiracy to offer and give a bribe to said defendant, but as to defendant Keyes, himself, a criminal conspiracy cannot be properly charged.''

It appears obvious that the rule which holds that there cannot be a conspiracy between the donor and donee of a bribe stems from the essential requirement that there be a *common* unlawful motive. The giver expects a different type of consideration than the donee receives and hence a different motive or intent is involved. Assuming for the moment that the purposes and objectives of Spirits Foundation were specifically prohibited by a statute, it is apparent that in paying Mr. Bonelli's campaign printing bills, Spirits Foundation had a motive entirely different from that of Mr. Bonelli in accepting the benefit. Under this rule petitioner could not have conspired with Mr. Bonelli because there is no evidence

whatsoever to show that he and Mr. Bonelli agreed to solicit or receive funds from liquor licensees. Here the undisputed evidence shows that petitioner was at all times employed by, and acted as agent for, Spirits Foundation which was the donor of any campaign contributions received by Mr. Bonelli from this source. There is no evidence from which an inference could be drawn that petitioner at any time acted for, or on behalf of, Mr. Bonelli in the solicitation of campaign contributions from liquor licensees. While it may be inferred that petitioner and Mr. Bonelli agreed that certain campaign contributions would be made, petitioner was always in the position of the donor and Mr. Bonelli the donee of such contributions and there could not have existed the common unlawful motive between them which is necessary to constitute a criminal conspiracy under the authorities above cited.

In *People* v. *Buffum,* 40 Cal.2d 709, 722 et seq. [256 P.2d 317], we held that a woman submitting to an abortion cannot be guilty of a conspiracy with the one committing the abortion. We said: ''Section 182 of the Penal Code, which proscribes conspiracy to commit a crime, is closely analogous to section 31. Both provisions operate generally with respect to crimes defined in other statutes, and both designate persons who may be punished because of their connection with activities pertaining to such crimes. In our opinion the same reasoning which precludes the application of section 31 for the purpose of prosecuting a woman as a principal under section 274 likewise precludes the use of section 182 in prosecuting her for conspiracy to violate section 274. Since as held in the Clapp case [24 Cal.2d 835 (151 P.2d 237) (accomplice)], the Legislature has expressed an intent that a woman who consents and voluntarily submits to an abortion is not punishable under section 274, it clearly did not intend that she should be punished for conspiracy to violate that statute. Although the language of section 182, standing alone, is sufficiently broad to include any agreement to procure an abortion, the provision, like that in section 31, is general and must yield to the specific provision in section 275. Any other construction would mean that the conspiracy law could be used as a device for defeating the legislative intention of imposing a lesser penalty on a woman who violates section 275 than is prescribed for a person convicted under section 274.

''There are many cases arising under other statutes in which it has been recognized that a defendant may be liable to prosecution for conspiracy to commit a given crime even

though he is incapable of committing the crime itself. (See e.g., *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 224-225 [footnote] [60 S.Ct. 811, 84 L.Ed. 1129]; *United States* v. *Rabinowich,* 238 U.S. 78, 86 [35 S.Ct. 682, 59 L.Ed. 1211]; *People* v. *Wood,* 145 Cal. 659, 664-665 [79 P. 367]; see also cases collected in annotations in 131 A.L.R. 1110, 1114-1115; 5 A.L.R. 782, 787-791.)   This rule, however, does not apply where the statutes defining the substantive offense disclose an affirmative legislative policy that the conduct of one of the parties involved shall be punished. (*Gebardi* v. *United States,* 287 U.S. 112, 121-123 [53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370]; *In re Vince,* 2 N.J. 443 [67 A.2d 141, 145]; see *Pinkerton* v. *United States,* 328 U.S. 640, 643 [66 S.Ct. 1180, 90 L.Ed 1489]; *State* v. *McLaughlin,* 132 Conn. 325 [44 A.2d 116, 120-121].)  Similarly, the rule should not be applied where, as here, the Legislature singles out one of the parties for special treatment by enacting a statute which deals only with the conduct of that person and provides for a lesser punishment than is given to the other party.'' (See also *People* v. *Stone,* 89 Cal.App.2d 853, 869 [202 P.2d 333], wherein it was held that there could be no conspiracy in such a case.)  In *State* v. *Tennyson,* 212 Minn. 158 [2 N.W.2d 833, 837, 139 A.L.R. 987], the same problem was involved and it was held that the one performing the abortion and the one submitting thereto could not be conspirators. Reliance was placed on the rule that the giving and taking of bribes were separate and distinct offenses.

Here, as in the Buffum case, the Legislature has singled out one of the parties for ''special treatment'' by making it a crime to solicit, receive, etc., campaign contributions from licensees. The Legislature did not see fit in the statute under consideration to make it a crime for any licensee to contribute voluntarily. Here, the ''statutes defining the substantive offense disclose an affirmative legislative policy that the conduct of one of the parties involved shall be unpunished'' (*People* v. *Buffum,* at page 722). In *Gebardi* v. *United States,* 287 U.S. 112, 119-120 [53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370], the Supreme Court had this to say: ''We come thus to the main question in the case, whether, admitting that the woman, by consenting, has not violated the Mann Act, she may be convicted of a conspiracy with the man to violate it. Section 37 of the Criminal Code (18 U.S.C., § 88), punishes a conspiracy by two or more persons 'to commit any offense against the United States.' The offense

which she is charged with conspiring to commit is that perpetrated by the man, for it is not questioned that in transporting her he contravened section 2 of the Mann Act. *Cf. Caminetti* v. *United States,* 242 U.S. 470 [37 S.Ct. 192, 61 L.Ed. 442]. Hence we must decide whether her concurrence, which was not criminal before the Mann Act, nor punished by it, may, without more, support a conviction under the conspiracy section, enacted many years before.

"As was said in the Holte case (p. 144 [*United States* v. *Holte,* 236 U.S. 140 (35 S.Ct. 271, 59 L.Ed. 504, L.R.A. 1915D 281)]), an agreement to commit an offense may be criminal, though its purpose is to do what some of the conspirators may be free to do alone. Incapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it. For it is the collective planning of criminal conduct at which the statute aims. The plan itself is a wrong which, if any act be done to effect its object, the state has elected to treat as criminal, *Clune* v. *United States,* 159 U.S. 590, 595 [16 S.Ct. 125, 40 L.Ed. 269, 271]. And one may plan that others shall do what he cannot do by himself. See *United States* v. *Rabinowich,* 238 U.S. 78, 86, 87 [35 S.Ct. 682, 59 L.Ed. 1211, 1214, 42 Am.Bankr.Rep. 255].

"But in this case we are concerned with something more than an agreement between two persons for one of them to commit an offense which the other cannot commit. There is the added element that the offense planned, the criminal object of the conspiracy, involves the agreement of the woman to her transportation by the man, which is the very conspiracy charged. . . .

"We do not rest our decision upon the theory of those [therefore cited and here omitted] cases, nor upon the related one that the attempt is to prosecute as conspiracy acts identical with the substantive offense. *United States* v. *Dietrich,* 126 F. 664. *We place it rather upon the ground that we perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected by her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished.* We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable

incident of all cases in which the woman is a voluntary agent at all, but does not punish, was automatically to be made punishable under the latter. *It would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers.''* (Emphasis added; see also *Freeman* v. *United States* (conspiracy to commit offense of unlawfully selling heroin), 146 F.2d 978; *People* v. *Purcell* (conspiracy to play poker), 304 Ill.App. 215 [26 N.E.2d 153]; *Dodson* v. *United States* (conspiracy to violate Mann Act) (Ky.), 215 F.2d 196; *United States* v. *Hagan* (conspiracy to harbor fugitive), 27 F.Supp. 814.)

The third count of the indictment is, apparently, based upon the fact that petitioner did not keep detailed books and records of his expenditures and that many of the checks drawn on both funds were drawn either to him personally or to cash. In some instances there were no receipts for the monies expended. Petitioner explained that many of them were drawn for travelling expenses, salary checks to various employees, bills that he had incurred, liquor bills where the liquor had been donated by Spirits Foundation to charitable organizations, to candidates who did not wish their constituents to know that a liquor organization was backing them.* Many of these expenditures were listed under the heading ''Campaign Contributions.'' There is again no evidence which shows, or tends to show, that Mr. Bonelli had anything to do with the manner in which petitioner's books and records were kept. There is, further, no evidence which either shows, or tends to show, that petitioner's books were kept with the purpose claimed by the People—that they were ''misleading, false and deceitful'' and so prepared ''with the intent to allow the same to be produced for fraudulent and deceitful purposes upon trials, proceedings and inquiries authorized by law, for the purpose of perverting and obstructing justice and the due administration of the law.'' The majority, however, rely on the ''Aldine receipt,'' the ''setting up by Woolever of fictitious ledger accounts to evidence funds received from Bonelli and Calhoun, the checks given to the non-existent Allied Printing Company, the substitution of a new check for that made out by the Mexican Village to Bonelli's campaign fund, Calhoun's use of the Research and Public Relations Fund as a channel for

---

*It is inferable that some of these cash checks were used to pay printing bills for Mr. Bonelli's campaign.

remittances from the Spirits Foundation, the transactions in the name of the National Democratic Club of California, and other activities which, a reasonable grand juror might infer, were done with the intent to disguise their nature." I have heretofore discussed the "Aldine receipt." So far as the Woolever fictitious ledger accounts are concerned, the majority opinion shows merely that Woolever himself set the account up and at Bonelli's request charged it with three checks, one of which was a Spirits Foundation check. There is nothing to show that Calhoun knew that Woolever did no printing for Proposition 3 or that a Spirits Foundation check was charged to such an account. The only inference to be drawn from such evidence is that Bonelli was guilty of double-crossing his benefactors. There is no evidence in the record that Calhoun knew that the Allied Printing Company was not in existence and again, the only inference to be drawn is that Bonelli was guilty of a subterfuge. So far as the substitution of a new check for that made out by the Mexican Village to Bonelli's campaign fund, that was part of the mass of evidence relating to Bonelli's program of solicitation from retail liquor licensees and the author of the majority opinion has not succeeded in any way whatsoever in connecting Calhoun with that program or with Bonelli's participation in that program. The case of the Mexican Village check is another instance where the author of the majority opinion has grasped at a tiny particle of immaterial evidence in the massive record and tossed it into his horrendous mess. Calhoun's use of Spirits Foundation funds has been heretofore discussed in detail and even to the most casual reader it must be apparent that the evidence as it relates thereto does not lead to an inference that Calhoun was guilty of solicitation or of keeping false books with the purpose charged. The transactions relating to the National Democratic Club have nothing at all to do with Calhoun. Only the vaguest recollection of Mr. Kennedy in 1955 that he *thought* Calhoun told him in 1950 to bill that club is the basis for the statements made in the majority opinion.

The majority opinion singles out several isolated bits of evidence and from these bits builds unwarranted inference upon illogical inference. We are told that on one occasion the Aldine Printing Company billed the Business Men's Association for $3,000 as a charge for printing some booklets; that when Weigel told Calhoun of this bill, Calhoun told him to write a check on the public relations fund for $1,500;

that later Calhoun received from Weigel cash for the ''balance of $1507'' ($1,500 plus $1,500 equals $3,000; $1,507 plus $1,500 equals $3,007) and that later Calhoun presented a receipt from the Aldine Printing Company for *that* amount. We are then informed that the record shows that the receipt was fictitious and did not represent a cash payment but was given to acknowledge receipt of several small checks made payable to Aldine. *Then* comes the inference! That it is ''reasonable'' to assume that these checks were from retail liquor licensees either in San Diego or Long Beach. What the record really shows is this: That Feinstein testified that Calhoun had never asked him for a fictitious invoice; that Weigel did not say he got the receipt from Calhoun but that *''We* got a receipt *from the Aldine Company* for the $1,507.35, whatever it was——''; that there is not one scrap of evidence to show that Calhoun had anything whatsoever to do with the receipt or, what is more important, that he knew of its so-called fictitious character; that there is absolutely nothing in the record to show *what* small checks comprised the payment.

The next bit of evidence is the Judson transaction. The author of the majority opinion doesn't even try to tie Calhoun in with that. The only point in the evidence is that Bonelli had a Spirits Foundation check in his possession which he asked Judson to cash for him. There is nothing to show that Calhoun even knew of the transaction or that Judson ever heard of Calhoun. In fact the evidence is to the contrary. In the same paragraph, however, we are informed that a check made payable to James Garibaldi was ''handled the same way.'' What the record really shows is this: That when the check was delivered to Mr. Garibaldi's office, he was out of town; that the purpose of the check was to pay Mr. Garibaldi for work to be done on Proposition 3; that Mr. Garibaldi was informed of this when he telephoned his secretary later in the day and at that time told her he would not be able to accept the employment; that she deposited the check and drew another one payable to Calhoun's secretary at his request. From this the majority infer that Bonelli and Calhoun acted in concert to use Bonelli's position for their private gain in the ''Judson and Garibaldi transactions.''

Other evidence relied upon by the majority opinion is that Calhoun was seen in Bonelli's office; that he there paid, with Spirits Foundation funds, certain campaign expenses in-

curred by Bonelli. This, again, shows only that Calhoun was guilty of violating the statute respecting donations but does not have a thing to do with the crime with which he was charged. While the majority opinion covers numerous pages, a close reading thereof will show that these "bits" of evidence from which the staggering number of inferences are drawn are reiterated over and over again—and that the balance of the evidence set forth relates only to Bonelli and his program of solicitation from retail liquor licensees. Because a witness testified in 1955 that he "*thought*" Calhoun directed him, in the year 1950, to bill the National Democratic Club for certain outdoor advertising for Bonelli, it is inferred that "Calhoun knew that the club would be receiving funds to be made available to Bonelli and the source of such funds" and that this is a "direct link between Calhoun and the proceeds from solicitation of retail liquor licensees."

We are also informed that several thousands of dollars, in addition to those received from the Spirits Foundation, were deposited in the Research and Public Relations Fund by wholesale liquor licensees of whom Calhoun was not an agent and that this was "direct evidence that Calhoun 'received' money for Bonelli's campaign and from his intimate participation in Bonelli's campaign it is a reasonable inference that he acted in concert with Bonelli in doing so." As I have said before the *only* inference which can logically and reasonably be drawn is that Calhoun was using wholesale liquor funds to support Bonelli's campaign. There is not one scintilla of any kind of evidence, direct or otherwise, that he had anything to do with the solicitation of those funds; or that he conspired with Bonelli in soliciting such funds. There is no evidence whatsoever that Calhoun was not in Bonelli's office on Spirits Foundation business. In fact, the entire record shows that he was there on Spirits Foundation business.

The majority is forced to admit that there is nothing in the record to link Calhoun with the cashing of retail liquor licensee checks by Bonelli but then illogically concludes that it may reasonably be inferred that these transactions were a "logical outgrowth of the conspiracy."

In answer to my argument that there can be no conspiracy between the donor and the donee, the author of the majority opinion says that there "is little dispute, however, that the evidence shows an elaborate conspiracy to utilize contribu-

tions from both retail and wholesale liquor licensees to finance Bonelli's political campaigns. Inferences which reasonably may be drawn from that evidence fully support the conclusion that Calhoun was connected with the general program of the Bonelli campaigns in other ways than solely as a donor to them.'' The author apparently ran out of inferences because he fails to draw any at this point. There is ample evidence to show that Calhoun was a donor of Spirits Foundation funds, but the only evidence linking him with Bonelli as a solicitor is that he was seen in Bonelli's office. Mere association does not make a conspiracy (*Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153 [183 P.2d 724]); even though direct proof of a formal understanding between parties to a conspiracy is not required (*Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859]).

We said in *People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344], that ''It must be remembered that the evidence before a committing magistrate at a preliminary examination need not be such as would require a conviction. Section 872 of the Penal Code provides that the defendant must be held to answer if 'it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof.' Section 1487, subdivision 7, of the Penal Code provides that a party is entitled to discharge upon habeas corpus proceedings where he has 'been committed on a criminal charge without reasonable or probable cause'; 'sufficient cause,' therefore, means no more than that. (*People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367]; *Cleugh* v. *Strakosch* (C.C.A. 9), 109 F.2d 330; *In re Martinez,* 36 Cal.App.2d 687 [98 P.2d 528].) 'Reasonable and probable cause' may exist although there may be some room for doubt.'' (*In re McCarty,* 140 Cal.App. 473, 474 [35 P.2d 568]; *In re Mesquita,* 139 Cal.App. 91 [33 P.2d 459]; *Ex parte Heacock,* 8 Cal.App. 420 [97 P. 77]; *Ex parte Vice,* 5 Cal.App. 153 [89 P. 983].) Applying the above rules to this case, it is at once obvious that the evidence at the very most leads only to speculation that Calhoun was guilty as charged. The strongest evidence produced from which even the vaguest inference of his guilt could be drawn is that he was seen in Bonelli's office. The author of the majority opinion confuses the issue by reciting all the evidence relating to Bonelli's *solicitation* and then scrambling that evidence with evidence of Calhoun's *donation* of Spirits Foundation funds. Taking the scrambled mess as a whole

it appears clear to me that it would not lead a "man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." There is much more than some room for doubt here—there is only speculation that Calhoun is guilty as charged. "Speculation" certainly does not measure up to any definition of probable cause with which I am familiar.

The majority opinion here depicts with unusual force the merit in the following quotation from Mr. Justice Jackson's concurring opinion in *Krulewitch* v. *United States*, 336 U.S. 440, 445 et seq. [69 S.Ct. 716, 93 L.Ed. 790]: "The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.

"The modern crime of conspiracy is so vague that it almost defies definition. Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. . . .

"An accused, under the Sixth Amendment, has the right to trial 'by an impartial jury of the State and district wherein the crime shall have been committed.' The leverage of a conspiracy charge lifts this limitation from the prosecution and reduces its protection to a phantom, for the crime is considered so vagrant as to have been committed in any district where any one of the conspirators did any one of the acts, however innocent, intended to accomplish its object.

"The trial of a conspiracy charge doubtless imposes a heavy burden on the prosecution, but it is an especially difficult situation for the defendant. The hazard from loose application of rules of evidence is aggravated where the Government institutes mass trials. . . .

"A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other. There are many practical difficulties in defending against a charge of conspiracy which I will not enumerate. . . .

"There is, of course, strong temptation to relax rigid standards when it seems the only way to sustain convictions of evil-doers. But statutes authorize prosecution for substantive crimes for most evil-doing without the dangers to the liberty of the individual and the integrity of the judicial process that are inherent in conspiracy charges. We should disapprove the doctrine of implied or constructive crime in its entirety and in every manifestation. And I think there should be no straining to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purposes served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction."

I have heretofore shown that the statute (Elec. Code, § 5002.5) proscribes only the solicitation or receipt of campaign contributions from licensees and not the giving thereof. I have also carefully examined the record and have failed to find any evidence to substantiate the charge that petitioner conspired with Mr. Bonelli in either soliciting or receiving funds for Mr. Bonelli's campaign. I find only that petitioner, as executive secretary of a trade association, Spirits Foundation, received dues from its members, a percentage of which funds were used voluntarily to pay printing and advertising bills for Mr. Bonelli in his campaign for reelection to the State Board of Equalization. Inasmuch as the Legislature did not see fit to make the voluntary donation of such funds a crime under this statute, it follows that there is no evidence connecting petitioner with the crimes charged in the indictment and the writ should therefore issue.

I would, therefore, let the writ of prohibition issue as prayed for.

SCHAUER, J., dissenting.

Because the record in this case discloses what appear to have been widespread and unlawful practices of a highly unsavory character, participated in by persons with whom this petitioner had dealings or was employed, and, as to certain activities, by himself, it is difficult to confine our thinking to the narrow legal question upon which we must rule.

As to the law generally as stated in the majority opinion I am in full accord with the principles there expressed but in careful detailing of the evidence, and as to the law which by our prior decisions should be applicable upon the facts

which are shown either directly or by tenable inference, I am impelled to the conclusion that Mr. Justice Carter's dissent is well taken.

The majority opinion correctly summarizes the charges averred in counts 1, 2 and 3 of the indictment. Each and all of those counts confine their charges of criminality by petitioner to acts committed in confederation with board member Bonelli either in soliciting and collecting contributions for him and his objectives, or a like confederation "to prepare misleading, false and deceitful papers . . . with the intent to allow the same to be produced for fraudulent . . . purposes . . . for the purpose of perverting . . . justice . . .''

It is my view that the entire record, fairly considered, leads unmistakably to the conclusion that at least as to the first two counts the grand jury proceedings were conducted on the theory that it was unlawful for a licensee to *contribute*, voluntarily or otherwise, to a campaign fund of any member of the Board of Equalization. Section 5002.6 of the Elections Code expressly covers such a situation and the evidence appears amply sufficient to establish that the petitioner's employers were licensees, and that they did make and that petitioner participated in making, such prohibited contributions. However, for some reason which is not readily apparent, the indictment which was returned does not charge violation of, or conspiracy to violate, section 5002.6. Instead, as hereinabove indicated, it specifically charges the petitioner with (Count I) conspiring with board member Bonelli to violate section 5002.5 of the Elections Code in that they did "feloniously combine . . . and agree together to commit the crimes of soliciting, asking and receiving cash political contributions and . . . things of monetary value from persons who were named in licenses to sell alcoholic beverages issued by the Board of Equalization"; (Count II) with conspiring with the board member and others "to do acts injurious to the public morals and to pervert and obstruct justice and the due administration of the laws; . . . to use the . . . official position of membership of the Board of Equalization . . . for the private gain of said co-conspirators in that said defendants and their co-conspirators did agree among themselves that they would unlawfully collect funds from licensees and applicants for licenses of the Board of Equalization . . . ''; and (Count III) with confederation in the preparation of false papers or records, as hereinabove indicated.

I agree with the holding of the majority that the statute

in question (Elec. Code, § 5002.5) is a valid exercise of the police power and that, as held in *Bompensiero* v. *Superior Court* (1955), 44 Cal.2d 178, 183-184 [281 P.2d 250], an indictment will not be set aside or a prosecution thereon prohibited if there is a rational ground for the conclusion that an offense has been committed and the accused is guilty of it. But the offense for which there is a rational ground of believing the defendant guilty must be the offense which is charged in the indictment. Only recently we held that ''A person cannot be convicted of an offense (other than a necessarily included offense) not charged against him by indictment or information, whether or not there was evidence at his trial to show that he had committed that offense.'' (*In re Hess* (1955), 45 Cal.2d 171, 174-175 [288 P.2d 5].)

Upon the record before us I see no rational ground upon which any of the charges laid against petitioner could be sustained. Conceivably, he might be convicted (since the grand jury indicted) if the evidence in the record were presented to a jury, but upon appeal (or even on habeas corpus) on such a record I think we should be bound to reverse. The conviction would no more be tenable than the conviction in the Hess case, *supra*. True, the rule is different on this proceeding from what it would be on appeal, and I have already indicated my recognition of that difference by my reference to *Bompensiero* v. *Superior Court* (1955), *supra*, 44 Cal.2d 178, 183-184, but the record here does not withstand the Bompensiero test. I cite the Hess case to illustrate the futility of putting the state and the defendant to the expense of a trial on an indictment charging specific offenses but upon evidence which proves other offenses.

For the reasons stated I would issue the writ of prohibition.

Petitioner's application for a rehearing was denied January 25, 1956. Carter, J., and Schauer, J., were of the opinion that the application should be granted.